Argued January 12, affirmed March 23, 1973

# MONTGOMERY ET AL, *Respondents, v.*
## FIRST NATIONAL BANK,
*Appellant.*
508 P2d 428

*Dean DeChaine,* Portland, argued the cause for appellant. With him on the briefs were Miller, Anderson, Nash, Yerke & Wiener, Portland.

*Gerald R. Pullen,* Portland, argued the cause for respondents. With him on the brief was Roger G. Rose, Portland.

Before O'CONNELL,[*] Chief Justice, and McALLISTER, DENECKE, HOLMAN, TONGUE and BRYSON, Justices.

BRYSON, J.

Plaintiffs brought this action against the defendant bank for conversion of a draft in the amount of $5,000 issued by an insurance company. The draft of

---

[*] O'Connell, C.J., did not participate in the decision of this case.

$5,000 was made payable to defendant Smith and plaintiff R. A. Montgomery. Smith forged Montgomery's endorsement on the draft and received full payment on the instrument from defendant bank. Defendants Smith and Besco Construction Company are nominal defendants and not parties to this appeal. The trial court, sitting without a jury, entered judgment in favor of plaintiffs. The defendant bank appeals. We affirm.

The evidence discloses the following facts. Plaintiff R. A. Montgomery is president and a shareholder of plaintiff M & S Construction Co. (M & S), and defendant Evans Smith is president of defendant Besco Construction Company (Besco). On April 1, 1968, M & S sold to Smith and Besco a seven-acre parcel of real estate, with a two-story building, located in Troutdale, Oregon. Smith's purpose in purchasing the property was to recondition the building to enhance its value, insure it heavily, burn it down, and collect the insurance proceeds.

Smith and Besco purchased the property for $50,000, paying $10,000 down. The purchase agreement obligated the purchasers to insure the building against fire in an amount not less than $40,000. In the event of a fire, the insurance proceeds were to be paid to the vendor to reduce the unpaid balance of the purchase price.[1]

---

[1] The purchase agreement provided:

"4. Purchasers agree to keep the buildings on said premises insured against loss by fire or other casualty in an amount not less than $40,000.00 with loss payable to the parties hereto as their interests appear at the time of loss with priority in payment to Vendor. Any amount received by Vendor under the insurance in payment of a loss shall be applied upon the unpaid balance of the purchase price and shall reduce said unpaid balance to the extent of the amount of the insurance payment received by Vendor. All uninsured losses shall be borne by Purchasers, on or after the date Purchasers become entitled to possession."

Smith refurbished the building and insured it with Farmers Insurance Group for $100,000, together with heavy coverages for equipment, stock, and fixtures. Although there was no mortgage on the property and M & S was the actual conditional vendor holding the security interest, R. A. Montgomery was named in the policy as mortgagee due to erroneous information given the insurer by Evans Smith.

Smith had the building set on fire on April 13, 1968. The fire caused some structural damage but was extinguished before the building was extensively burned. Smith decided to repair the building with the money he received from the insurance company for the partial loss. Within one month of the fire Smith received three insurance company drafts totaling approximately $40,000. Because of the policy's mortgagee loss payable endorsement, the draft for $5,000 involved in this litigation, representing a partial payment for fire loss to the building, named both Smith and Montgomery as payees. Smith forged Montgomery's signature on the back of the draft, presented it to defendant bank, and received the face value.

Smith spent $15,000 to $20,000 of the fire insurance proceeds to repair the building and install several improvements. On August 21, 1968, after the repairs had been completed, the property was appraised and valued at $56,000. Smith and Besco subsequently defaulted on their purchase agreement, and in March 1969 plaintiff M & S sued to foreclose on the contract. In April 1969 Evans Smith was tried on various criminal charges and during the trial, Montgomery, who had been subpoenaed as a witness, first learned of Smith's forgery of the $5,000 insurance draft.

While the M & S foreclosure suit was pending, Mr. and Mrs. Gene L. Davis acquired the interests of

Smith and Besco in the subject property. M & S and the Davises signed a settlement agreement effective November 1, 1969, whereunder M & S would take a decree of foreclosure in its suit and then sell the property to the Davises. Under the terms of the sale, M & S was able to recoup all expenses incurred in the foreclosure suit, all taxes and fire insurance paid on the property since the default of Smith and Besco, and all principal and interest which would have been due under the sale to Smith and Besco. Additionally, the Davises agreed to pay the remaining principal on terms more favorable to M & S than in the original sale. In short, the settlement relieved M & S of virtually all its losses in the transaction with Evans Smith and Besco.

In the settlement with the Davises, M & S agreed to apply in reduction of the purchase price any fire insurance proceeds received by it as a consequence of the fire on April 13, 1968. At the time of the fire, M & S owned a separate fire insurance policy written by Centennial Insurance Co. in the amount of $10,000. On October 29, 1969, M & S settled its claim on this policy for $2,000 in anticipation of a recovery from Farmers Insurance Group of the $5,000 involved in the forged draft. The proceeds of the settlement were credited to the Davises in reduction of their obligation to M & S, as required by the settlement agreement.

The defendant bank's first assignment of error contends that as a matter of law there was no forgery of the draft in question. Defendant relies on the "fictitious payee" rule embodied in ORS 73.4050(1)(b), which states:

"(1) An indorsement by any person in the name of a named payee is effective if:

"(b): A person signing as or on behalf of a

maker or drawer intends the payee to have no interest in the instrument * * *."

The draft in this case was drawn by a Mr. Hunt, the fire claim manager for Farmers Insurance Group. Evans Smith testified that he conspired with Hunt on the forged endorsement and that Hunt received $2,000 from the draft when Smith cashed it. Defendant contends that this demonstrates that Hunt never intended R. A. Montgomery to have an interest in the draft.

There clearly was a forgery in this case so the question is whether the drawer (Hunt) intended the payee (Montgomery) to have an interest in the draft. ORS 73.4050(1)(b).

Neither party called Mr. Hunt as a witness so the only testimony is that of Smith. The plaintiffs impeached Smith's testimony on cross-examination by eliciting his admission that he had been convicted of approximately twenty-six felonies.

Whether or not Mr. Hunt intended R. A. Montgomery to have an interest in the draft is a question of fact. We are required to uphold the trial court's judgment in favor of the plaintiff if there is sufficient evidence to sustain it, and all factual disputes concerning the circumstances must be resolved in a manner most favorable to the plaintiff. *Multnomah Co. v. Oregon Auto Ins. Co.,* 256 Or 24, 27, 470 P2d 147, 149 (1970). The evidence that Hunt wrote the draft and named R. A. Montgomery as a co-payee supports a finding that Hunt did intend Montgomery to have an interest in the instrument. The trial court found in favor of the plaintiff and therefore disregarded Smith's testimony concerning Hunt's intention in writing the draft. The court did not err in concluding that the

"fictitious payee" rule in ORS 73.4050 (1)(b) was not applicable to the facts of this case.

In its second assignment of error, the defendant bank contends that as a matter of law it is not liable for conversion of the instrument in question because it was a collecting bank in this transaction.

Defendant argues that ORS 73.4190(3) precludes an action for conversion against a collecting bank which has dealt with a negotiable instrument in good faith. ORS 73.4190 states, in part:

"(1)  An instrument is converted when:
"* * * * * *

"(c)  It is paid on a forged indorsement.
"* * * * * *

"(3)  Subject to the provisions of the Uniform Commercial Code concerning restrictive indorsements a representative, including a depositary or collecting bank, who has in good faith and in accordance with the reasonable commercial standards applicable to the business of such representative dealt with an instrument or its proceeds on behalf of one who was not the true owner is not liable in conversion or otherwise to the true owner beyond the amount of any proceeds remaining in his hands.
"* * * * * *"

The draft in this case states:

"FARMERS INSURANCE GROUP

[Policy number — Claim number]

In settlement of all claims arising out of accident or loss occurring on the accident date shown here

Please Present Promptly
For Payment

PAY Five thousand and no/100 Dollars to the order

of Evans Smith dba Besco Constuction [sic] Co. and
R. A. Montgomery.

Payable only through East Portland Branch
THE FIRST NATIONAL BANK OF OREGON

/s/    A. E. Hunt
Claims Representative Signature"

■■ Thus, a collecting bank is protected from an
action for conversion only when it has dealt with the
instrument "in accordance with the reasonable com-
mercial standards applicable to the business of such
representative * * *." The burden of proof as to this
defense rests on the collecting bank.

The following testimony of Evans Smith is the
only evidence in the record concerning the circum-
stances surrounding defendant's acceptance and pay-
ment of the draft in question.

"Q   Now, how long had you dealt with this east
Portland branch of the First National Bank?

"A   Oh, I would estimate a year, perhaps.

"Q   Were you known personally in there?
"A   Yes, I was.

"Q   Now, did the teller you go to—you went to
on that day with this $5,000 instrument—did you
know her personally?

"A   Yes, but I don't recall—I knew all of the
tellers in there, but I don't recall which one cashed
this particular one.

"Q   Was any inquiry made about Mr. Mont-
gomery's signature?

"A   No, there was not.

"Q   It was already signed when you got to the
bank, is this correct?

"A   Yes.

"Q   Did you endorse it in front of this teller, or just pass it already endorsed by yourself?

"A   Oh, I probably would—I don't know. I could have already endorsed it, or she could have seen me endorse it. It wouldn't make any difference.

"Q   But there was no question made by the teller as to who R. A. Montgomery was on this draft?

"A   No. You must understand I was running an enormous amount—a number of checks through there, and they never questioned the payee endorsement. They never questioned, did this person sign.

"Q   Did the teller say anything about what type of instrument this was?

"A   No.

"Q   Just accepted it and gave you the two thousand and deposited it to your account?

"A   Yes."

The bank statement of Smith, or Besco Construction Company, was received in evidence. It reveals that Smith did deposit $3,000 to his account with defendant bank on May 3, 1968 (the date the draft was issued), and then issued checks withdrawing the $3,000.

Uncontradicted testimony shows that defendant bank failed to inquire as to the legality of the R. A. Montgomery signature on the draft, treated the draft as though it was a negotiable bank check, and paid the instrument although the draft stated, on its face, "payable through." ORS 73.1200 provides:

"An instrument which states that it is 'payable through' a bank or the like designates that bank as a collecting bank to make presentment but does not of itself authorize the bank to pay the instrument."

The comments published in 1962 by the Legislative

Counsel Committee state, in reference to ORS 73.1200, the following:

> "*Purposes:* Insurance, dividend or payroll checks, and occasionally other types of instruments, are sometimes made payable 'through' a particular bank. ORS 73.1200 states the commercial understanding as to the effect of such language. The bank is not named as drawee, and it is not ordered or even authorized to pay the instrument out of the drawer's account or any other funds of the drawer in its hands. Neither is it required to take the instrument for collection. in. the. absence of special agreement to that effect. It is merely designated as a collecting bank through which presentment is properly made to the. drawee."

■ We hold that defendant bank failed to deal with this draft in accordance with the reasonable commercial standards practiced in the banking business and, therefore, defendant has failed to establish the defense to conversion set forth in ORS 73.4190(3).

Defendant bank next contends that the trial court erred in rendering its judgment in favor of plaintiff M & S because M & S failed to plead or prove that it was entitled to a recovery against defendant. Defendant stresses that this plaintiff was not a named insured under the Farmers Insurance Group policy and was not a named payee on the draft.

All evidence adduced at trial indicated that M & S was the intended loss payee on the fire insurance policy and but for the mistaken designation of R. A. Montgomery as the mortgagee, M & S would have been named as co-payee on the draft instead of Montgomery. At the beginning of the trial the parties stipulated, on the record, to certain facts. The following colloquy occurred.

"THE COURT: Is M & S Construction Com-

pany actually interested in this, or is R. A. Montgomery under the loss payable clause?

"MR. PULLEN: Well, M & S Construction Company will be the party in interest. This policy was issued by Mr. Evans Smith, and he just named Montgomery individually, rather than naming the corporation. I don't believe that is an issue here, but any proceeds would go to the corporation.

"THE COURT: O.K.

"MR. PULLEN: Then that about wraps up our stipulations * * *."

There was no contrary position taken by defendant's counsel and he stated:

"Now, the land was owned by M & S Construction Company. They sold under this contract and Evans Smith, through Farmers, obtained this insurance; and, of course, they made a mistake in that particular policy and they made a mortgagee's endorsement and they named Montgomery as loss payee instead of M & S Construction Company. I don't think there is any dispute that Montgomery had no interest in the building or in the property other than what interest his corporation, M & S Construction, would have."

■ ■ The record is devoid of any objection to the joinder of M & S as a party plaintiff. Defects in the joinder of parties are, in the absence of a timely objection, waived. ORS 16.330.⊗ *See DeCicco v. Ober Logging Co.,* 251 Or 576, 581, 447 P2d 297, 300 (1968). In view of the evidence that M & S was the mortgagee and owner of the property and intended payee of the draft, and in view of the oral stipulations, the trial

⊗ ORS 16.330:
"If no objection is taken, either by demurrer or answer, the defendant shall be deemed to have waived any objection, save for the objection to the jurisdiction of the court, and the objection that the complaint does not state facts sufficient to constitute a cause of action. * * *"

court did not err in granting judgment in favor of plaintiff M & S. *See McKay v. Horseshoe Lake Hop Harv.,* 260 Or 612, 615, 491 P2d 1180 (1971).

Defendant bank's last assignment of error presents a difficult question. The bank contends that plaintiffs failed to prove that they were damaged by defendant's payment of the draft on a forged endorsement. In support of this assignment of error, defendant urges three arguments:

1. Any diminution in plaintiffs' security caused by the fire was nullified by Smith's subsequent repairs and improvements which restored the building to a value in excess of plaintiffs' security interest.

2. The settlement of the foreclosure suit with the Davises exonerated plaintiffs of any damages they may have suffered from the nonreceipt of the insurance funds represented by the draft.

3. Since plaintiffs agreed, as part of the foreclosure settlement, to turn over to the Davises any fire insurance proceeds received as a result of the fire, the recovery in this case, if any, belongs to the Davises, not plaintiffs. Therefore, plaintiffs were not damaged by defendant bank's payment of the draft. These arguments will be dealt with seriatim.

The loss payable clause in the fire insurance policy was intended to insure the conditional vendor against damage to the building and thereby furnish collateral security for the satisfaction of the vendees' debt. See 5A J. Appleman, Insurance Law and Practice § 3401 (1970). The special effect of a standard mortgagee loss payable clause was explained in *Haskin et al v. Greene,* 205 Or 140, 150-51, 286 P2d 128, 133 (1955), quoting an Illinois case:

"* * * Under such a clause the fire insurance

company is obligated by independent contract to pay the insurance moneys directly to the mortgagee, even though he be the purchaser at the foreclosure sale * * *.

" * * * * *

" * * * The doctrine is well established by the decisions of this State, that when a mortgage clause, like the one here, is attached to a policy of insurance, it operates to create a new and distinct contract between the underwriter and the mortgagee. After such clause is attached there are two contracts of insurance in force by reason thereof and by reason of the policy; one of which is a contract between the underwriter and the insured, and the other is between the underwriter and the mortgagee.' " (Citations omitted.)

*Cf. Meader v. Far. Mut. Fire Relief Ass'n,* 137 Or 111, 1 P2d 138 (1931).

8. The question posed by defendant's first argument is whether or not the owner can affect the secured party's independent contract right to the fire insurance proceeds by repairing the burned premises. Annot., 91 ALR 1354 (1934) discloses a split of authority on the question, and the division has persisted to the present. See cases collected in *Wolf v. Home Ins. Co.,* 100 NJ Super 27, 241 A2d 28 (1968), *aff'd* 103 NJ Super 357, 247 A2d 345 (1968), and *Citizens Ins. Co. v. Foxbilt, Inc.,* 226 F2d 641, 53 ALR2d 1376 (8th Cir 1955). Under the "New York Rule," the policy is considered a contract of indemnity for the payment of a predetermined sum upon the occurrence of a fire which diminishes or endangers the security. If such a fire occurs, the underwriter is obligated to indemnify the secured party according to the policy, notwithstanding the fact that the security remains ample or is restored by the owner through repairs. *See, e.g., Savarese v. Ohio*

*Farmers' Ins. Co.,* 260 NY 45, 182 NE 665, 91 ALR 1341 (1932). Under the "Wisconsin Rule," which is apparently a minority view, the secured party can recover under the policy only if he can demonstrate that his security has been impaired by the fire. If the secured property remains sufficiently valuable to assure payment of the debt notwithstanding the fire, or if the owner restores the property through repairs, the secured party has suffered no loss under the policy, and he cannot recover. *See, e.g., Ramsdell v. Insurance Co. of North America,* 197 Wis 136, 221 NW 654 (1928), and the dissenting opinions in *Savarese v. Ohio Farmers' Ins. Co., supra.*

We have not yet decided this question, but it was considered tangentially in *Haskin v. Greene, supra.* In *Haskin* we held that under a standard mortgagee loss payable clause, a mortgagee in possession of the premises as a result of a foreclosure has, upon the occurrence of a fire, an option to repair the burned premises or apply the insurance proceeds to the mortgage debt. In the unanimous opinion, Justice LUSK, after discussing the aforementioned split of authority, stated in dictum:

> "* * * We would suppose that, if such an option does reside in the mortgagee while the mortgage is in full force and effect and the mortgagor is in possession of the premises, it should, for a stronger reason, be available to a mortgagee who has gone into possession of the premises as a purchaser at execution sale.

> "These decisions bear on the present question only remotely. Basically, they involve application of the rule that fire insurance is a contract of indemnity. Will the insurance company be permitted to escape liability by pleading that the mortgagee has sustained no loss because the owner of the land

has restored his security? Or, when the insurance company has paid the loss to the mortgagee and the owner has made the repairs, will the insurance money inure to the benefit of the owner for the same reason? Both these questions are answered in the negative in what we consider to be the better reasoned opinions. The contract of insurance is given effect according to its terms. * * *" 205 Or at 155.

■ The policy in this case insured the secured party's interest as it existed at the time of loss. "Time of loss" clearly has reference to the date of the fire. *See Dakin v. Queen City Fire Insurance Co.*, 59 Or 269, 273, 117 P 419, 421 (1911). We would ignore the intentions of the parties to the insurance contract if we permitted the insurance company, or defendant bank, who can assert no greater rights than the insurance company, to claim the benefit of subsequent collateral events such as the repair of the building by the owner.

■ We invoke this same reasoning to dispose of defendant bank's argument that the foreclosure settlement with the Davises put plaintiffs in as good a position as they were in prior to the fire. The interest of the conditional vendor insured by the policy was the debt of the vendee. That interest was jeopardized by the fire and as of the date of the fire, Farmers Insurance Group became obligated to compensate the conditional vendor according to the terms of its agreement. The insurer's obligation was not cancelled by subsequent collateral agreements entered into by the insured party which mitigated his damages from the fire.

■ Defendant bank's final argument concerning damages is the contention that the Davises are the real party in interest in this action because the proceeds

of the judgment will belong to them. The pertinent portion of the foreclosure settlement agreement with the Davises states:

> "* * * It is understood that the Vendor [M & S] may have valid insurance claims arising out of loss to the property which occurred in April of 1968. Any sums received by the Vendor on account of such loss shall be applied to the purchase price. Vendor will, on Purchasers' [Davises'] demand, assign such claim or claims to Purchasers for processing and enforcement. Any sums received by the Purchasers as the result of such claims will be paid to the Vendor and applied on the purchase price."

This provision cannot be interpreted as an executed assignment of the right of M & S to the insurance claim since there is no evidence of an intent to make the Davises the present owners of the claim. See 3 S. Williston, Law of Contracts §§ 424, 430 (Jaeger 3d ed (1960)). At most, plaintiff M & S agreed to apply any insurance proceeds it received to the Davises' debt.

A judgment for plaintiffs in this action might accrue to the Davises' benefit, but a judgment for defendant bank would not affect them since no right of the Davises is at stake in this action. *Cf. Pulkrabek v. Bankers' Mortgage Corp.,* 115 Or 379, 238 P 347 (1925). We are satisfied from the record that plaintiffs suffered recoverable damages from defendant's action and find no error in this assignment.

Affirmed.

TONGUE, J., concurs in the result.