## HELMUT STEINER ET AL. *v.* MIDDLESEX MUTUAL ASSURANCE COMPANY
### (15766)

Dupont, C. J., and Lavery and Healey, Js.

Argued October 31, 1996—officially released March 11, 1997

*Joel J. Rottner*, with whom was *Robyn L. Sondak*, for the appellant (defendant).

*Frank J. Kolb, Jr.*, with whom, on the brief, was *David Crow*, for the appellees (plaintiffs).

HEALEY, J. This case arises out of a dispute over a fire loss between residential property owners and their fire insurer. The defendant, Middlesex Mutual Assurance Company, had issued a homeowner's insurance policy to the plaintiffs, Helmut Steiner and Michelle Steiner, insuring their Westport residence against loss or damage by fire. On August 18, 1992, their residence was extensively damaged by fire. The parties were unable to agree on the value of the damages, and they, therefore, agreed to have the matter of the loss determined through an appraisal[1] process provided under

---

[1] Section 1—Conditions, 6. provides: "Appraisal. If you and we fail to agree on the amount of loss, either may demand an appraisal of the loss. In this event, each party will choose a competent appraiser within 20 days after receiving a written request from the other. The two appraisers will choose an umpire. If they cannot agree upon an umpire within 15 days, you or we may request that the choice be made by a judge of a court of record in the state where the residence premises is located. The appraisers will separately set the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will set the amount of loss.

Each party will:

a. pay its own appraiser; and

b. bear the other expenses of the appraisal and umpire equally."

the policy. The parties thereafter, on January 26, 1993, executed, inter alia, on a printed form the following memorandum of appraisal:

"This memorandum by and between Helmut Steiner & Michelle Brown Steiner of the first part and the Middlesex Mutual Insurance Company of the second part:

"Witnesseth: that whereas the party of the first part claims to have sustained a loss by Fire occurring on the 18th day of August 1992 to and upon the following described property to wit: Building & Code up Grades & establish length of repair period. 249 Greens Farms Road Westport CT and

"Whereas policy # 1277049 issued by the party of the second part to the party of the first part provides as follows:

"2. Appraisal

"If the insured and the company fail to agree as to the amount of loss, each shall, on the written demand of either, made within sixty days after receipt of proof of loss by the company, select a competent and disinterested appraiser, and the appraisal shall be made at a reasonable time and place. The appraisers shall first select a competent and disinterested umpire, and failing for fifteen days to agree upon such umpire, then, on the request of the insured or the company, such umpire shall be selected by a judge of a court of record in the county and state in which such appraisal is pending. The appraisers shall then appraise the loss, stating separately the actual cash value at the time of loss and the amount of loss, and failing to agree shall submit their differences to the umpire. An award in writing of any two shall determine the amount of loss. The insured and the company shall pay his or its chosen appraiser

and shall bear equally the other's expenses of the appraisal and the umpire.' and,

"Whereas, a disagreement has arisen between the parties hereto as to the amount of such loss.

"Therefore[2] This Memorandum Witnesseth: that in conformity to the terms and conditions of the policy of the party of the second part, Dallas Dodge Sr. . . . and Alan Tancreti . . . have been selected and are hereby appointed appraisers, to appraise, in accordance with the terms and conditions of said policy, the replacement value of said property and the amount of loss directly caused by said fire to and upon the same. . . ."

The two appraisers and the umpire, chosen in accordance with the insurance contract, met and, on May 3, 1993, rendered an "initial appraisal award." That appraisal was itemized as follows: building—replacement cost value-$1,440,000; building—actual cash value-$864,000; loss—replacement cost value-$858,559.62; loss—actual cash value-$600,000.[3] As the trial court correctly noted, this May 3, 1993 appraisal was "limited" in that it did not take into account any necessary code upgrades in the undamaged areas of the insureds' premises. It expressly stated[4] that "code upgrades not considered in undamaged areas."[5] After the completion of the May 3, 1993 appraisal, authorities

---

[2] The word "therefore" has been described "in its ordinary acceptation as meaning 'consequently' and 'for those reasons previously stated.' Webster's New International Dictionary, (2d ed.) p. 2621." *States* v. *Wines,* 47 N. J. Super. 235, 240, 135 A.2d 543 (1957).

[3] These figures appear on the back of the memorandum of appraisal signed by the parties on January 23, 1993.

[4] The trial court found, citing the January 10, 1994 affidavit of the plaintiffs' appraiser and the September 14, 1995 "Memorandum of Appraisal" signed by both appraisers and the umpire, that the appraisers had considered code upgrades in determining the value of the damaged portion of the premises.

[5] This statement appears on the memorandum of appraisal signed by the parties on January 23, 1993.

from the town of Westport determined that the undamaged portion would have to be upgraded to meet the Westport code requirements.

Thereafter, the parties apparently tried to negotiate a settlement of the values for the code upgrades in the undamaged areas. They were unable to agree. As a result of that impasse, the plaintiff commenced this declaratory judgment action on August 13, 1993. After the Westport authorities determined that upgrades would be required in the undamaged portion, the parties continued with the appraisal.

On September 14, 1995, the appraisers and the umpire issued a memorandum of appraisal, which stated, inter alia, that the award of May 3, 1993, "left code upgrades in undamaged areas open."[6] That memorandum also said that a meeting that took place sometime after May 30, 1995, "during which meeting it was determined that as a result of the fire, the building had to be brought up to current code before a Certificate of Occupancy could be issued for reoccupancy." It was further determined that it was physically and economically impractical to repair the structure to comply with all applicable building codes. It was then determined that the most logical way to comply with all appropriate codes would be the complete demolition of the building and the construction of a new structure in its place. The September 14, 1995 appraisal developed a total replacement value, inclusive of demolition, of $1,652,017.78. This award noted that "the prior award for the fire loss . . . did include necessary code upgrades in the damaged areas equaling a replacement cost value loss of $858,559.62." This appraisal then deducted "the previ-

---

[6] In their later "Memorandum of Appraisal," dated September 14, 1995, the appraisers and the umpire also state that "the initial appraisal award was completed on May 3, 1993, which addressed the fire damages *only*, *leaving necessary code upgrades in undamaged areas as an open entity*." (Emphasis added.)

ous award from the values developed" and went on to say that "the award [now] equals $793,458.10 which represents the replacement cost value *for this portion of the appraisal*." (Emphasis added.) This appraisal also pointed out that "it was further agreed that establishment of the actual cash value of the building *as previously developed* [had been] $864,000.00" (Emphasis added.) It then reset the actual cash value, stating that "the actual cash value of the building inclusive of code upgrades is [now] $991,210.62."

The plaintiffs then filed a motion to confirm the appraisal award. The defendant filed a "limited" objection to the confirmation of the appraisal award, alleging that "the submission to the appraisers for the second portion of the appraisal award, which is the subject of the plaintiff's Motion to Confirm, was to determine the increased costs and for the total cost to repair and replace the damaged property taking into account the necessary code upgrades. . . . In making said determination it was not necessary to determine the actual cash value of the building subsequent to its replacement and restoration and in accordance with code upgrades . . . ." In addition, the defendant filed an application to vacate the arbitration award, which sought "an order vacating a portion of [the] arbitration award [of September 14, 1995] . . . to the extent that the award . . . exceeded the submission. . . ."

In its decision, the trial court pointed out that, after the issuance of the initial appraisal award, dated May 3, 1993, and the plaintiffs' institution of their declaratory judgment action, the parties "agreed to submit the issue of the total value of code upgrades, including that in undamaged areas, for appraisal." It further noted that, as a result, on September 14, 1995, a second appraisal was rendered, which listed the actual cash value of the building, inclusive of all code upgrades, at $991,210.62.

The trial court stated that the defendant filed an objection to the plaintiffs' motion to confirm and that, thereafter, it filed its motion to vacate that award "on the ground that it exceeded the scope of submission in that it determined what the actual cash value of the building would be subsequent to its replacement in accordance with code upgrades. Thus, the defendant requests that an order be issued vacating that portion of the September 14, 1995 award." The court then determined that although the defendant had filed a motion to vacate[7] the award "in light of the language in [its] request, the court believes that the defendant intended to file a motion to modify the award."[8]

After stating that "[b]oth parties have essentially acknowledged that the purpose of the appraisal was *only* to establish figures regarding the amount of loss" (emphasis added), it concluded that "[h]aving reviewed

[7] General Statutes § 52-418, entitled "Vacating award," provides in pertinent part: "(a) Upon the application of any party to an arbitration, the superior court . . . or, when the court is not in session, any judge thereof, shall make an order vacating the award if its finds any of the following defects: (1) If the award has been procured by corruption, fraud or undue means; (2) if there has been evident partiality or corruption on the part of any arbitrator; (3) if the arbitrators have been guilty of misconduct in refusing to postpone the hearing upon sufficient cause shown or in refusing to hear evidence pertinent and material to the controversy or of any other action by which the rights of any party have been prejudiced; or (4) if the arbitrators have exceeded their powers or so imperfectly executed them that a mutual, final and definite award upon the subject matter submitted was not made. . . ."

[8] General Statutes § 52-419, entitled "Modification or correction of award," provides in pertinent part: "(a) Upon the application of any party to an arbitration, the superior court for the judicial district in which one of the parties resides or, when the court is not in session, any judge thereof, shall make an order modifying or correcting the award if it finds any of the following defects: (1) If there has been an evident material miscalculation of figures or an evident material mistake in the description of any person, thing or property referred to in the award; (2) if the arbitrators have awarded upon a matter not submitted to them unless it is a matter not affecting the merits of the decision upon the matters submitted; or (3) if the award is imperfect in matter of form not affecting the merits of the controversy. . . ."

the record, this court is not of the opinion that the appraisers acted upon a matter outside the charge submitted to them. Accordingly, the September 14, 1995 Memorandum of Appraisal is confirmed *to the extent* that it provides a determination of respective [actual] cash and replacement cost values." (Emphasis added.) It is clear on the record before this court that the trial court granted the plaintiffs' motion to confirm the September 14, 1995 award and denied the defendant's motion to vacate that award.

# I

The defendant maintains that the trial court acted improperly in granting the plaintiffs' motion to confirm the appraisal award of September 14, 1995, and in denying the defendant's motion to vacate that award. It argues that the second appraisal award should have been vacated because it exceeded the scope of the submission by redetermining the actual cash value of the property at the time of the second appraisal. The defendant claims that the matter of actual cash value of the loss, both under the policy and the submission, had been fully determined at the time of the first appraisal of May 3, 1993. It is the defendant's position that, in determining the actual cash value, the only relevant time and the only time contemplated by the policy, is the time of the loss, i. e., the fire of August 18, 1992. That element should not have been revisited or reevaluated, argues the defendant, at the time of the second appraisal. The defendant claims that the only matter left open by the first appraisal was "the amount to be allowed of a replacement cost basis for code upgrades to the undamaged portion of the property." Therefore, it contends there was a "limited submission" for the "supplemental award" of September 14, 1995. That award was limited not only by its submission, but also by the contract of insurance between the parties. To allow the redetermination of actual cash value in

the award of September 14, 1995, to stand would, the defendant claims, contravene applicable law, the objective of which is to provide personal indemnity to the property owner commensurate with the loss actually sustained.

On the other hand, the plaintiffs claim that the trial court acted properly in granting their motion to confirm and in denying the defendant's motion to vacate the September 14, 1995 appraisal award because that award conforms to the contract between the parties as well as to the submission. The submission, they claim, did not restrict the conduct, procedure and method of the appraisal that they say allowed the parties to alter the procedure and method by mutual agreement. The plaintiffs also argue that there was only one submission, that of January 26, 1993. The submission was not in any way limited, according to the plaintiffs. That is so, they argue, because the appraisal award of September 14, 1995, completes what the appraisers expressly left open in their May 3, 1993 award when they stated "code upgrade not considered in undamaged areas." They contend that later, when authorities determined that the undamaged portion of the residence would have to be upgraded to meet the Westport building code, the appraisers reconvened by the mutual consent of both parties and issued a complete award on September 14, 1995. This award, they argue, "was not a second appraisal but a continuation of the original one." This was necessary, the plaintiffs claim, because "the appraisers were charged with appraising the plaintiffs' entire loss within the terms of their contract." Further, the plaintiffs indicate that, even if this court decides to vacate the replacement cost value of $1,652,107.78 as set out in the second appraisal award, they are still entitled to an immediate payment of $391,210.62, which represents the difference between the actual cash val-

ues of $600,000 and $991,210.62, as set out in the first and second awards respectively.

## II

Our Supreme Court has held that an appraisal clause in the standard form fire insurance policy as set out in General Statutes § 38a-307, such as the appraisal clause in the policy in this case, "constitutes an agreement to arbitrate and falls within the ambit of our arbitration statutes, General Statutes §§ 52-408 through 52-424. *Covenant Ins. Co.* v. *Banks*, 177 Conn. 273, 279, 413 A.2d 862 (1979)." *Giulietti* v. *Connecticut Ins. Placement Facility*, 205 Conn. 424, 432, 534 A.2d 213 (1987); *Middlesex Mutual Assurance Co.* v. *Clinton*, 38 Conn. App. 555, 564, 662 A.2d 1319, cert. denied, 235 Conn. 922, 666 A.2d 1186 (1995), cert. denied, 517 U.S. 1104 , 116 S. Ct. 1320, 134 L. Ed. 2d 473 (1996). "The parties themselves, by the agreement of submission, define the powers of the arbitrator. . . . The submission constitutes the charter of the entire arbitration proceedings and defines and limits the issues to be decided. . . . When the parties have agreed to a procedure and have delineated the authority of the arbitrator, they must be bound by those limits. . . . An application to vacate or correct an award should be granted where an arbitrator has exceeded his power. In deciding whether an arbitrator has exceeded his power, [the court] need only examine the submission and the award to determine whether the award conforms to the submission." (Citations omitted.) *Bic Pen Corp.* v. *Local No. 134*, 183 Conn. 579, 583–84, 440 A.2d 774 (1981). As noted, "[i]n determining whether a submission is unrestricted, we look to the authority of the arbitrator." *Fraulo* v. *Gabelli*, 37 Conn. App. 708, 715, 657 A.2d 704 (1995). "The authority of an arbitrator to adjudicate the controversy is limited only if the agreement contains express language restricting the breadth of issues, reserving explicit rights, or conditioning the award on court review. In

the absence of any such qualifications, an agreement is unrestricted." *Garrity* v. *McCaskey*, 223 Conn. 1, 5, 612 A.2d 742 (1992); *International Assn. of Firefighters, Local 1339, AFL-CIO* v. *Waterbury*, 35 Conn. App. 775, 778, 647 A.2d 361 (1994). When parties mutually agree to submit their dispute to arbitration, judicial review is limited in scope and the resulting award is not reviewable for errors of law or fact. See *Hartford* v. *Board of Mediation & Arbitration*, 211 Conn. 7, 14, 557 A.2d 1236 (1989); *New Haven* v. *AFSCME, Council 15, Local 530*, 208 Conn. 411, 415–16, 544 A.2d 186 (1988); *Greater Bridgeport Transit District* v. *Amalgamated Transit Union, Local 1336*, 28 Conn. App. 337, 343, 610 A.2d 1324 (1992). "Even in the case of an unrestricted submission [however, our Supreme Court has] recognized three grounds for vacating an award: (1) the award rules on the constitutionality of a statute . . . (2) the award violates clear public policy . . . or (3) the award contravenes one or more of the statutory proscriptions of § 52-418." (Citations omitted.) *Garrity* v. *McCaskey*, supra, 6; *Fraulo* v. *Gabelli*, supra, 716. "Since the parties consent to arbitration, and have full control over the issues to be arbitrated, a court will make every reasonable presumption in favor of the arbitration award . . . . The party challenging the award bears the burden of producing evidence sufficient to invalidate or avoid it, and only upon a showing that it 'falls within the proscriptions of § 52-418 . . . or procedurally violates the parties' agreement' will the determination of an arbitrator be subject to judicial inquiry." (Citations omitted.) *O & G/O'Connell Joint Venture* v. *Chase Family Ltd. Partnership No. 3*, 203 Conn. 133, 145–46, 523 A.2d 1271 (1987); *Malecki* v. *Burnham*, 181 Conn. 211, 214, 435 A.2d 13 (1980). While it is required that the arbitrator render an award that conforms to the submission, the award need not contain an explanation of the means by which he

reached that award. See *Bic Pen Corp.* v. *Local No. 134,* supra, 585.

### III

Prior to deciding what was submitted to the appraisers, we must determine how many submissions were made. We agree with the plaintiffs that there was only one submission.

The "Revised Memorandum of Appraisal," dated January 23, 1993, is the *only* document in the record before us signed by the plaintiffs and the defendants submitting this dispute to the appraisal process under their insurance contract. After setting out that the plaintiffs claim that they have sustained a loss by fire on August 18, 1992, on their property, to wit "Building Code Upgrade," the memorandum sets out the appraisal provision of their policy and that there is "a disagreement . . . between the parties . . . as to the amount of such loss."

The award of May 3, 1993, comported with the submission and made the necessary determinations as to value and loss including actual cash value. That award on its face, however, left open only the matter of code upgrades in the undamaged areas, as demonstrated by the statement placed directly under the values they had found, "code upgrade not considered in undamaged areas." This is underscored by the "Memorandum of Appraisal" dated September 14, 1995,[9] which was not a result of a new submission, as the defendant appears to argue, but was the undertaking to continue and complete what had expressly been left undone by this May 3, 1993 award. The September 1995 award specifically indicates that the earlier award "left code upgrades in undamaged areas open" and that "the initial appraisal

---

[9] The September 14, 1995 document was signed by both appraisers and the umpire.

award [of May 3, 1993] . . . addressed fire damages only, leaving necessary code upgrades on undamaged areas as an open entity."

This clause, after setting out that "in conformity to the terms and conditions of the policy," the two named appraisers stated that they "have been selected and are hereby appointed appraisers, to appraise, in accordance with the terms and conditions of said policy *the replacement value of said property and the amount of loss directly caused by said fire to and upon the same.*" (Emphasis added.) "The terms and conditions of said policy" include, of course, the appraisal clause. The authority thus conferred on the appraisers was intended to empower them to resolve the *entire* matter referred to them—the matter of value and loss. This was, therefore, an unrestricted submission.

Having decided that there was only one submission and that the submission was unrestricted, we now consider whether the award conformed to the submission. In doing so, we keep in mind the defendant's claim that the appraisers exceeded the scope of the submission by their award in their September 14, 1995 memorandum in which they arrived at new figures for both actual cash value and replacement cost value rather than determining only the cost of the now required code upgrades as to the undamaged areas. The focal point of the defendant's contention is the improper reevaluation or revisiting of the computation of actual cash value in the September 1995 award, which the defendant maintains had already been set at $864,000 in the May award.

Before deciding whether the award conformed to the submission, we should turn to the trial court's interpretation of that award. This is necessary because the trial court's decision stated that "the September 14, 1995 Memorandum of Decision is confirmed *to the extent* that it provides a determination of respective cash and

replacement cost values." (Emphasis added.) During oral argument, counsel were heard as to what the trial court meant by the "to the extent" language as well as to the apparent omission of a word after "respective" in the same sentence.

Our Supreme Court has said that "[t]he construction of a judgment is a question of law for the court. . . . As a general rule, judgments are to be construed in the same fashion as other written instruments. . . . The determinative factor is the intention of the court as gathered from all parts of the judgment. . . . The interpretation of a judgment may involve the circumstances surrounding the making of the judgment. . . . Effect must be given to that which is clearly implied as well as that which is expressed." (Citations omitted; internal quotation marks omitted.) *Lashgari* v. *Lashgari*, 197 Conn. 189, 196–97, 496 A.2d 491 (1985); *Emerick* v. *Emerick*, 28 Conn. App. 794, 806, 613 A.2d 1351, cert. denied, 224 Conn. 915, 617 A.2d 171 (1992). In doing so, it assists a reviewing court to keep in mind the theory on which the case was tried and on which the trial court decided it. See *Builders Service Corp.* v. *Planning & Zoning Commission*, 208 Conn. 267, 299 n.19, 545 A.2d 530 (1988); *Fuessenich* v. *DiNardo*, 195 Conn. 144, 151, 487 A.2d 514 (1985).

It is a fair synthesis from what counsel said orally and in their briefs that "to the extent" was analytically not language of limitation but was regarded by them as the trial court's granting of the plaintiff's motion to confirm and denying the defendant's motion to vacate. We agree. With reference to the apparent omission of a word after "respective," it was suggested at oral argument that the trial court meant "actual" and that this was borne out by the use of the plural "values" at the end of the sentence. We agree. Actually, therefore, the only *new* dollar values set out in the September 14, 1995 memorandum were the "total replacement value

inclusive of demolition" of $1,652,017.78 and the "actual cash value of the building including code upgrades" of $991,210.62.[10]

Now, we take up the issue of whether the award as confirmed by the trial court, exceeded the submission. In doing so we keep in mind that we have already decided that the submission to the appraisers of January 26, 1993, was unrestricted. The fact that the May 3, 1993 report did not fully complete their charge does not make the January 26, 1993 charge any more restricted. Their May 3, 1993 report completed their original charge except by their own express reservation that "code [upgrades were] not considered in undamaged areas." Once the Westport building authorities required code upgrades in the undamaged areas, that decision triggered the appraisers' duty to complete what had been originally submitted to them. To do so, however, did not require anything but their determination of the "increased cost"[11] brought by doing so. They expressly stated[12] that in their September 14, 1995 memorandum of appraisal. This is underscored by their statement in the same document that the "initial appraisal award . . . completed on May 3, 1993 . . . *addressed the fire*

---

[10] In their September 14, 1995 memorandum, the appraisers pointed out that when the prior replacement cost value of $858,559.62 was deducted from the new total replacement value of $1,652,017.78 that yielded the figure of $793,458.16 that represented the replacement cost value for this portion, the September 14, 1995 portion of the appraisal. They also pointed out that the actual cash value "of the building as previously developed" was $864,000 and that, as of September 14, 1995, "the actual cash value of the building inclusive of code upgrades is $991,210.62."

[11] This September 14, 1995 memorandum of appraisal stated that their "initial charge" was completed on May 3, 1993 and that award left code upgrades in undamaged areas open and that the subsequent charge to the appraisers was to determine *the increased cost* brought about by the application of building codes in completing repairs.

[12] The September 14, 1995 "Memorandum of Appraisal" also expressly states that "the prior award [of May 3, 1993] *for the fire loss* . . . did include necessary code upgrades in the *fire damaged area*. . . ." (Emphasis added.)

*damages only, leaving necessary code upgrades in undamaged areas as an open entity."* (Emphasis added.)

In returning to do what remained to be done, the appraisers, however, did not have to revisit their earlier computation of the actual cash value of the plaintiffs' loss as insured by the defendant under the insurance contract. In doing so they have, according to the defendant, contravened General Statutes § 52-418 (a) (4), which empowers the Superior Court to vacate an award "if the arbitrators have exceeded their powers or so imperfectly executed them that a mutual, final and definite award upon the subject matter submitted was not made."

One commentator has said that "[f]ire insurance is a contract of indemnity against actual loss sustained by the insured, in an amount not exceeding that stipulated in the policy, unless it is written as a valued policy, in which case, in the absence of fraud or other illegality, the amount of the loss, if total, is immaterial." 1 G. Couch, Insurance (2d Ed. Rev. 1984) § 1.52. A "contract of fire insurance is a personal contract for indemnity for the insurable interest possessed by the insured at the time of the issuance of the policy, and also at the time of loss." 4 J. Appleman & J. Appleman, Insurance Law and Practice (1969) § 2107. The Connecticut Supreme Court long ago said a "policy of fire insurance is an agreement to *indemnify* the insured against loss by fire . . . ." (Emphasis added.) *Finch* v. *Great American Ins. Co.*, 101 Conn. 332, 337, 125 A. 628 (1924). "The contract of fire insurance is one of indemnity so far as direct loss or damage is concerned . . . ." 1 G. Richards, Insurance (1952) § 13, citing *Finch* v. *Great American Ins. Co.*, supra, 332.

Against this backdrop, we point out that it has been said that "[t]he actual cash value policy is a pure indem-

nity contract. Its purpose is to make the insured whole but never to benefit him because a fire occurred. [6 J. Appleman & J. Appleman, Insurance Law and Practice § 3823]; *Brand Distributors, Inc.* v. *Insurance Co. of North America*, [532 Fla. 352 (4th Cir. 1976)]." *Traveler's Indemnity Co.* v. *Armstrong*, 442 N.E.2d 349, 352 (Ind. 1982). In Connecticut "the scope of the appraisers' powers and duties is limited by the terms of the policy, by the statutory provisions of [General Statutes § 38a-307], and by judicial precedent, solely to a determination of the amount of the actual cash value of the fire loss." *Sullivan* v. *Liberty Mutual Fire Ins. Co.*, 174 Conn. 229, 231, 384 A.2d 384 (1978).[13] This determination is ordinarily a question of fact. Id., 230–31.

Pursuant to the "conditions" of the policy, the "actual cash value" of the damage to the plaintiffs' covered residence was a significant factor under the relevant "Loss Settlement" conditions.[14] Conceptually, actual

---

[13] It is well recognized that in determining the amount of a fire loss there are three tests in general use by courts and appraisers to determine actual cash value. They are (1) market value, (2) replacement or reproduction cost and (3) the so called broad evidence rule. *Sullivan* v. *Liberty Mutual Fire Ins. Co.*, supra, 174 Conn. 232; see *Giulietti* v. *Connecticut Ins. Placement Facility, Inc.*, supra, 205 Conn. 429; *Castoldi* v. *Hartford County Mutual Fire Ins. Co.*, 21 Conn. Sup. 265, 154 A.2d 247 (1987). Courts define "actual cash value" differently in different states. O. Dykes, " 'Actual Cash Value': The Magic Words—What Do They Mean?" 16 Forum 391 (1981).

[14] Section I of the insurance contract, entitled conditions, contained the following provision:

"3. Loss Settlement. Covered property losses are settled as follows: Coverage for the property described below includes the full cost of repair or replacement, without deduction for depreciation, as follows:

a. Buildings under Coverage A and B . . . .

(2) To adjust losses, under COVERAGE A - DWELLING, we shall use the smaller of the following two amounts:

(a) The replacement cost at the time of loss of the building, or of any part of the building. . . .

(b) The actual and necessary amounts spent to repair or replace the building or any part of the building. . . .

"4. When the cost to repair or replace the damage is more than $2,500, we will pay no more than the *actual cash value* of the damage until actual repair or replacement is completed." (Emphasis added.)

cash value, by whatever measure it is reached, is intended to indemnify the insured. Ideally, it should not amount to undercompensation that fails to make the insured whole, nor should it be overcompensation that "would increase the moral hazard[15] by giving the insured motive to create a loss or be less than vigilant to prevent one." O. Dykes, " 'Actual Cash Value': The Magic Words —What Do They Mean?" 16 Forum 391, 397–98 (1981).

The policy also provided under "Additional Coverages" coverage for any increased repair cost, or increased rebuilding cost, or increased construction cost that the insured "may incur" if such was required by "Enforcement of Law or Ordinance." This provision provided the following:

"10. Building Loss Caused By Enforcement of Law or Ordinance. In the event of loss to your building(s) insured under this policy caused by a Peril Insured Against:

a. we will pay for *loss of the undamaged* building(s) value caused by demolition which is brought about because of the enforcement of any state or municipal law or ordinance regulating the construction, repair or demolition of buildings. It is a condition that this policy be in force at the time the covered loss, which necessitates the demolition of any undamaged portions of the building, occurs; and

b. we will pay you the reasonable costs that you incur in carrying out the enforced demolition order, including the cost of the removal of debris; and

c. we will pay you any increased repair cost, or increased rebuilding cost or increased construction cost *that you may incur* because of an enforcement of these laws, providing such repair, rebuilding or construction takes place on the same premises as the demolished building(s) and that the replacement construction is of like height, floor area, style and for like occupancy of the demolished building(s) covered under this policy." (Emphasis added.)

[15] The term "moral hazard" in this context has been commented upon by a number of courts. In *Niagara Fire Ins. Co.* v. *Everett*, 292 F.2d 100, 105 (5th Cir. 1961), the court stated: "Moral hazard, in insurance, is but another name for a pecuniary interest to the insured should the property burn." See also *Nemojeski* v. *Bubolz Mutual Town Fire Ins. Co.*, 271 Wis. 561, 564, 74 N.W.2d 196 (1956); *Soyland* v. *Farmers' Mutual Fire Ins. Co.*, 71 S.D. 522, 527–28, 26 N.W.2d 696 (1947). One court has said that "fire policy provisions precluding recovery of replacement cost until replacement is complete are reasonable as protection against 'the moral hazard,' and enforceable." *Bourrie* v. *U.S. Fidelity & Guaranty Ins. Co.*, 75 Or. App. 241, 246, 707 P.2d 60 (1985); see *Higgins* v. *Ins. Co. of North America*, 256 Or. 151, 469 P.2d 766 (1970).

There is no such "moral hazard" present in this case before us under its facts or any reasonable inference from the facts.

General Statutes § 38a-307 sets out what "[t]he standard form of fire insurance policy of the state of Connecticut . . . shall be . . . ." It provides in part that fire insurance may be provided: "In Consideration of the Provisions and Stipulations Herein or Added Hereto . . . [to the named insured] and legal representatives, to the extent of the actual cash value of the property *at the time of loss . . . against all direct loss by fire. . . .*" (Emphasis added.) Section 38a-307 also contains an appraisal clause.[16] The submission in this case charged the appraiser with the duty "to appraise the loss, stating separately the actual cash value at the time of loss and the amount of loss. . . ." The appraisers were further charged pursuant to the policy to appraise "the amount of loss caused directly by said fire. . . ." The phrase "time of loss," within the standard form of fire insurance policy, is the date on which the actual cash value of the property insured is to be determined, and that is the date of the fire. *Wolf* v. *Home Ins. Co.*, 100 N.J. Super. 27, 44–45, 241 A.2d 28 (1968), aff'd, 103 N.J. Super. 357, 247 A.2d 345 (1968); see *Montgomery* v. *First National Bank*, 265 Or. 55, 70, 508 P.2d 428 (1973). "Ordinarily, the measure of the benefits payable under fire insurance coverage is the actual cash value of the damaged or destroyed property." *S & S Tobacco &*

---

[16] The appraisal clause set out in General Statutes § 38a-307 provides the following: "In case the insured and this Company shall fail to agree as to the actual cash value or the amount of loss, then, on the written demand of either, each shall select a competent and disinterested appraiser and notify the other of the appraiser selected within twenty days of such demand. The appraisers shall first select a competent and disinterested umpire; and failing for fifteen days to agree upon such umpire, then, on request of the insured or this Company, such umpire shall be selected by a judge of a court of record in this state in which the property covered is located. The appraisers shall then appraise the loss, stating separately actual cash value and loss to each item; and, failing to agree, shall submit their differences, only, to the umpire. An award in writing, so itemized, of any two when filed with this Company shall determine the amount of actual cash value and loss. Each appraiser shall be paid by the party selecting him and the expenses of appraisal and umpire shall be paid by the parties equally."

*Candy Co.* v. *Greater New York Mutual Ins. Co.*, 224 Conn. 313, 315, 617 A.2d 1388 (1992); see *Church of the Assumption* v. *Travelers Fire Ins. Co.*, 146 Conn. 223, 225, 149 A.2d 906 (1959). It has been said that "[a]ctual cash value in a policy of insurance means what it would cost to replace a building or a chattel as of the date of the fire." *Fedas* v. *Ins. Co. of State of Pennsylvania*, 300 Pa. 555, 562, 151 A. 285 (1930); see also *Castoldi* v. *Hartford County Mutual Fire Ins. Co.*, supra, 21 Conn. Sup. 269. In the policy before us, under "Perils Insured Against," the defendant contracted, under the applicable coverages, to insure "against risks of *direct loss* to the type of property described in Coverage A and B only if that loss is a physical loss to property. . . ." (Emphasis added.) The submission, in charging the appraisers to determine the "amount of loss," required that they determine "the amount of loss directly caused by said fire. . . ." "It is well settled that the words 'direct cause' ordinarily are synonymous in legal intendment with 'proximate cause,' a rule applicable to causes involving the construction of an insurance policy." *Dixie Pine Products Co.* v. *Maryland Casualty Co.*, 133 F.2d 583, 585 (5th Cir. 1943), cert. denied, 319 U.S. 743, 63 S. Ct. 1033, 87 L. Ed. 1700, aff'd on remand, 145 F.2d 977 (5th Cir. 1944); see *Dubuque Fire & Marine Ins. Co.* v. *Caylor*, 249 F.2d 162, 164 (10th Cir. 1957). In an insurance policy that stated that it insured against "[l]oss . . . directly caused by," the court held that directly caused was fairly synonymous with proximately caused.' " *O'Doan* v. *Ins. Co. of North America*, 243 Cal. App. 2d 71, 78, 52 Cal. Rptr. 184 (1966). The actual cash value of the plaintiffs' residence at the time of the loss, i.e., the fire of August 18, 1992, and the amount of the loss directly caused by that fire were fully determined by the appraisers on May 3, 1993. There was, therefore, no need for them to reevaluate or recalculate the actual cash value after that date. This is so

for any one of three cogent reasons. First, their own report of May 3, 1993, expressly states, "code [upgrades] not considered in undamaged areas." That this was all that was admittedly left to be done is further emphasized by the appraisal memorandum of September 14, 1995, which states that "[the] award [of May 3, 1993] left code upgrades in undamaged areas open . . . ." Nothing else in that memorandum was stated, or even implied, to be "left open." Second, there can be no question that calculating the cost of the required code upgrades addresses a matter that was not directly caused by the fire itself, not only because the upgrades were in an area undamaged by the fire but also because such upgrades cannot be considered a "loss" under the policy as they did not exist at the time of the fire and hence were incapable of constituting a "loss directly caused by [the August 1992] fire." The payment of $864,000 to the plaintiffs as the actual cash value indemnified them for their loss. To require the defendants to pay any further sums to the plaintiffs goes beyond indemnity. Third, the potential for an insured to qualify for being paid by the defendant for the cost of code upgrades in the undamaged portion comes from "Additional Coverages,"[17] another type of coverage in this policy apart from that by which an insured can recover the actual cash value.[18]

---

[17] These arise under "Section 1—PERILS INSURED AGAINST Coverage A Dwelling & Coverage B OTHER STRUCTURES."

[18] Additional coverages under paragraph 10 (c) provides the following: "10. Building Loss Caused by Enforcement of Law or Ordinance. In the event of loss to your building(s) insured under this policy caused by a Peril Insured Against:

a. we will pay for loss of the undamaged building(s) value caused by demolition which is brought about because of the enforcement of any state or municipal law or ordinance regulating the construction, repair or demolition of buildings. It is a condition that this policy be in force at the time the covered loss, which necessitates the demolition of any undamaged portions of the building, occurs; and . . . .

c. we will pay you any increased repair cost, or increased rebuilding cost or increased construction cost that *you may incur* because of an enforcement of these laws, providing such repair, rebuilding or construction takes

Paragraph 10 (c)[19] of "Additional Coverages" provides for the recovery of the cost of governmentally ordered code upgrades as the insured *"may incur"* by virtue of such an order. (Emphasis added.) "Incur" means to "become liable or subject to." Webster's Third New International Dictionary; see Ballentine's Law Dictionary; see also *Czarnecki* v. *American Indemnity Co.*, 259 N.C. 718, 720, 131 S.E.2d 347 (1963). Only this cost was left for the appraisers to determine after their May 3, 1993 appraisal.

Moreover, although the appraisers in their September 19, 1995 memorandum developed a new total replacement cost value inclusive of demolition of $1,662,017.78, as opposed to their May 3, 1993 replacement cost figure of $858,559.66, the policy does provide for payment to an insured of the actual cost of the repair or replacement of a building when the actual repair or replacement is completed within a specified time.[20] This figure of $1,662,017.78 is based on the actual replacement of the plaintiffs' building. That point of reference does not exist as the building has not been rebuilt. They have not incurred any expense in that regard. Because, as we have shown the law and the facts to demonstrate,

place on the same premises as the demolished building(s) and that the replacement construction is of like height, floor area, style and for like occupancy of the demolished building(s) covered under this policy." (Emphasis added.)

[19] There is no evidence or claim that the cost of the code upgrades in the undamaged portion of the premises have in fact been incurred by the plaintiffs.

[20] One commentator has pointed out that "[p]roperty insurance policies which carry indorsements to the effect that replacement cost, in excess of actual cash value, may be recovered, sometimes also contain a provision that in order for the insured to recover under such an indorsement, he must repair or replace the property within a specified or reasonable time. The courts have generally construed such a provision according to its plain meaning." See "Construction and Effect of Provision of Property Insurance Policy Permitting Recovery of Replacement Cost of Property, in Excess of Actual Cash Value," 66 A.L.R.3d 885, 887 (1975); see also 1 A.L.R.5th 817, 827–28 (1992).

the only actual cash value figure that is focal is the figure that applies at the time of the loss, i.e., the fire of August 18, 1992, the appraisers could not properly determine a second actual cash value based on a building as replaced where that building has not been replaced. The defendant was required, under the policy, only to pay the plaintiffs if the building was, in fact, replaced. It was not. The policy provides that "where the cost to repair or replace the damage to the building is more than $2500, [the defendant] will pay no more than the actual value of the damage until actual repair or replacement *is completed.* . . ." (Emphasis added.) By recalculating actual cash value in the September 19, 1995 memorandum, the appraisers exceeded their powers under § 52-418 (a) (4),[21] because that award exceeded the original submission of January 26, 1993. They had completed their job by their award of May 3, 1993, in which they themselves admittedly left open only the determination of the cost of code upgrades in the undamaged portion. The actual cash value was determined as of the date of the loss, as the statute, the policy and the submission required.[22] In revisiting that item, the appraisers violated § 52-418 (a) (4). This award did not conform to the submission. We come to this conclusion recognizing that arbitration awards are generally upheld and are extended great deference because the arbitration process is favored as a means of settling disputes. *Garrity* v. *McCaskey*, supra, 223 Conn. 4–5; *Bridgeport* v. *Connecticut Police Dept. Employees Local 1159*, 32 Conn. App. 289, 292, 628 A.2d 1336 (1993); *Board of Education* v. *Hartford Federal of School Secretaries*, 26 Conn. App. 351, 352, 600 A.2d 1053 (1992). We, nevertheless, believe that this case is

---

[21] In addition, the appraisers also violated that portion of § 52-418 (a) (4) that provides "or so imperfectly executed them that a mutual, final and definite award upon the subject matter submitted was not made."

[22] The actual cash value determined was $864,000 and that sum has been fully paid by the defendant to the plaintiffs.

one of those rare cases where an arbitration award is to be vacated. We stress in this case that the appraisers' new replacement cost figure, coming about as it does from the unnecessary and improper determination of actual cash value, also underscores the fact that the appraisers exceeded their power.

Finally, there remains the matter of a proper order as to the appraisers' awards in this case. We have already decided that there was one submission to the appraisers, that of January 26, 1993. The appraisers, however, approached their tasks in two steps or two "awards." The appraisers made an award on May 3, 1993. That award has not been appealed. Their second award on September 14, 1995, has been the subject of this appeal. While technically we are not presented with the issue of the severability of an award, the claims of the parties have raised the issue of whether the actions of the appraisers throughout are pursuant to one submission, as the plaintiffs claim, or two submissions, as the defendant claims. We have resolved that issue in favor of the plaintiffs. The resolution of that issue affects our remand. Where parties arbitrate pursuant to a statute, the statute itself defines the powers of the arbitrators. *Caldor, Inc.* v. *Thornton*, 191 Conn. 336, 341, 464 A.2d 785 (1983), aff'd, 472 U.S. 703, 105 S. Ct. 2914, 86 L. Ed. 2d 557 (1985). In such a case, "[a]ny deviation by the arbitrators from the statutory bounds under which they operate would indicate that they had 'exceeded their powers,' *a basis for vacating any offending part of the award, under General Statutes § 52-418 (a) (4). Carofano* v. *Bridgeport*, 196 Conn. 623, 627, 495 A.2d 1011 (1985)." (Emphasis added.) *Chrysler Corp.* v. *Maiocco*, 209 Conn. 579, 591, 552 A.2d 1207 (1989); see *Local 63, Textile Workers Union* v. *Cheney Bros.*, 141 Conn. 606, 109 A.2d 240 (1954), cert. denied, 348 U. S. 959, 75 S. Ct. 449, 99 L. Ed. 748 (1955). In certain instances, "courts have affirmed one portion of an arbitration

award while setting aside the rest." *Mellon* v. *Travelers Ins. Co.*, 267 Pa. Super. 197, 198, 224, 406 A.2d 759 (1979).

As this case was presented, we do not have a problem of severability. Only the award of September 14, 1995, was appealed and is before us for determination, although it was necessary for us to address the May 3, 1993 award. While they may be interrelated for that reason, the two awards are substantively independent and differently structured. The second was intended to complete what was left open by the first. The conduct of the appraisers on the second, however, exceeded their powers under § 52-418 (a) (4). Only the cost of the code upgrades in the undamaged area of the residence was to be determined. Neither the parties nor the record before us disclose a dollar figure for such code upgrades. At oral argument it was suggested that the appraisers took that into account in arriving at the new actual cash value figure reported in the September 14, 1995 memorandum.

The judgment is reversed and the case is remanded with direction to render judgment vacating the appraisers' award of September 14, 1995, and for further proceedings to determine the cost of the code upgrades in the undamaged areas.

In this opinion the other judges concurred.