WILLIAM NORTHROP ET AL. *v.* ALLSTATE
INSURANCE COMPANY
(SC 15969)

Callahan, C. J., and Borden, Katz, Palmer and McDonald, Js.

---

Argued October 1—officially released December 1, 1998

*Linda L. Morkan,* with whom were *Daniel F. Sulli-van* and, on the brief, *Patricia E. McCooey,* for the appellant (defendant).

*Frank J. Raio*, with whom was *Jon D. Biller*, for the appellees (plaintiffs).

BORDEN, J. The defendant, Allstate Insurance Company, appeals[1] from the judgment of the trial court in favor of the plaintiffs, William Northrop and Cleo Northrop, in their action for the balance due under their homeowners' insurance policy covering their dwelling. The defendant claims that the trial court improperly awarded the plaintiffs the withheld depreciation portion of their fire insurance coverage and prejudgment interest on that amount. We disagree with the defendant's first claim, and agree with its second claim only with regard to the date from which the trial court calculated the interest due. We therefore reverse the judgment in part and remand the case to the trial court for a recalculation of the interest due.

The plaintiffs brought this action against the defendant claiming breach of contract based on the defendant's failure to pay the withheld depreciation portion of their fire insurance coverage, arising out of a fire loss that occurred on January 3, 1992.[2] The trial court determined that the plaintiffs were entitled to the withheld depreciation in the amount of $10,315.90, and awarded interest on that sum in the amount of $4401.49, from May 12, 1993, the date of a certain release from the plaintiffs to the defendant. This appeal followed.

[1] The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 65-1 and General Statutes § 51-199 (c).

[2] The plaintiffs also claimed a bad faith failure to pay by the defendant, and violations of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., and the Connecticut Unfair Insurance Practices Act (CUIPA), General Statutes § 38a-815 et seq. The plaintiffs withdrew the CUTPA and CUIPA claims prior to trial. The trial court found for the defendant on the bad faith claim, and the plaintiffs do not challenge that finding on appeal.

The following facts are not in dispute. The defendant was the insurer on a homeowner's policy covering the plaintiffs' home in East Haven when a fire damaged the home on January 3, 1992. The fire insurance portion of the policy included replacement cost coverage, for which the plaintiffs had paid a premium over and above the premium for actual cash value coverage.[3] The plaintiffs and the defendant reached an agreement, subsequently reflected in a sworn proof of loss statement submitted by the plaintiffs and accepted by the defendant, that the replacement cost for the fire loss was $74,724, and the actual cash value of the loss was $64,408.10. The difference between the two figures, $10,315.90, was then broken down in the proof of loss into a policy deductible of $250 and withheld depreciation of $10,065.90, which is the focus of the dispute in this case.[4] It is referred to as "withheld" depreciation

[3] In general terms, and as reflected in the insurance policy at issue in this case, the actual cash value of a fire loss in a case such as this is the cost of repairing or replacing the loss, less depreciation. See *Steiner* v. *Middlesex Mutual Assurance Co.*, 44 Conn. App. 415, 431–34, 689 A.2d 1154 (1997).

By contrast, replacement cost of a fire loss in a case such as this is the actual cost of repairing and replacing the loss, without a deduction for depreciation. As explained in the defendant's brief, the depreciation "refers to that sum which represents the decrease in value of the damaged property from the time of its construction until the time of the loss." Thus, as further explained by the defendant, replacement cost coverage "allows an insured to recover not only the actual cash value of the policy, but also the estimated depreciation of the property. In effect, replacement cost coverage goes beyond making the insured whole, giving him a new dwelling rather than the 'used' one which was damaged." It also relieves the homeowner, however, of the obligation to fund the depreciation portion of the loss and shifts that obligation to the insurer, a benefit for which the homeowner pays an additional premium. Typically, as reflected in the insurance policy in this case, the insurer does not become obligated to pay the depreciation portion of the loss until the homeowner has actually made the repair or replacement. *Steiner* v. *Middlesex Mutual Assurance Co.*, supra, 44 Conn. App. 432 n.15.

[4] Although the trial court rendered judgment for the plaintiffs in the amount of $10,315.90, purportedly representing the withheld depreciation, the proof of loss and the undisputed facts make it clear that the correct amount of the withheld depreciation is $10,065.90. Accordingly, on remand, the judgment should be corrected to reflect the correct amount.

because, under the terms of the policy, the defendant was not obligated to pay it until the plaintiffs actually completed the repair or replacement.

The pertinent provisions of the insurance policy provided: "Payment for covered loss to building structures insured under the Dwelling Protection coverage will be by one of the following methods: a) Replacement Cost. This means there will not be a deduction for depreciation. Payment will not exceed the smallest of the following amounts: 1) the replacement cost of that part of the building structure damaged for equivalent construction and use on the same premises; 2) the amount actually and necessarily spent to repair or replace the damaged building structure; or 3) [t]he limit of liability applicable to the building structure. We will not pay more than the actual cash value of the damaged building structure until the repair or replacement is completed. b) Actual Cash Value. This means there may be a deduction for depreciation. If you do not repair or replace the damaged building structure, payment will be on an actual cash value basis, not to exceed the limit of liability shown on the declarations page for Coverage A—Dwelling Protection."[5] Under these provisions, therefore, the defendant was obligated to pay the plaintiffs the actual cash value of the loss, irrespective of whether they repaired or replaced the damage. If they did so, however, the defendant was obligated to pay the plaintiffs the withheld depreciation when "the repair or replacement [was] completed."

It was also undisputed that, after the fire loss, the plaintiffs engaged a contractor, A. A. McNamara and Sons, Inc. (McNamara), to repair the damage. Their agreement was evidenced by four documents: (1) an authorization, dated January 9, 1992, signed by Cleo

---

[5] There is no dispute that the claims in this case were within the limits of liability of the insurance policy.

Northrop, to McNamara "to commence repairs to [the] property . . . which was damaged by fire on . . . [January 3, 1992]"; (2) a four page written proposal, dated September 26, 1992, from McNamara to the plaintiffs, specifying the work to be done; (3) a document purporting to be a "Home Improvement Contract," dated October 2, 1992, between McNamara and the plaintiffs, for work specified as "See Attached List," but to which no list was attached, for a total price of $74,724; and (4) a "Revised" five page proposal, dated June 7, 1993, specifying the work to be done.

The defendant paid the plaintiffs the actual cash value of $64,408.10 in two installments: (1) $5000 on July 8, 1992, and (2) $59,408.10 on May 27, 1993. Further, on May 12, 1993, after the negotiations over the actual cash value and replacement cost figures had been completed, the plaintiffs executed a release to the defendant of all claims, except the potential claim for withheld depreciation. Between May, 1993, and March, 1994, the plaintiffs paid McNamara a total of $63,143.66. After the defendant refused to pay the plaintiffs the withheld depreciation, this action ensued.

As reflected in the trial court's memorandum of decision, there were four areas of dispute at trial. First, the defendant claimed that the contract between the plaintiffs and McNamara was invalid because it did not comply with the Home Improvement Act (act), General Statutes § 20-418 et seq. The court rejected this claim as a matter of law, ruling that the act was for the benefit of consumers and could not be raised by the defendant in an action brought against it by its insured.

Second, the defendant claimed that the various documents comprising the alleged contract between the plaintiffs and McNamara were vague and so imperfectly drafted as to suggest that the plaintiffs and the contractor were participating in a series of pretenses, all

designed to defraud the defendant. Noting that certain actions would remain unexplained because the employee of McNamara who had drafted the documents had died before the trial, the court specifically found that, although the documentation was lacking in some respects, the documents constituting the contract between the plaintiffs and McNamara were sufficient because they described the work to be performed and the price to be paid. The court also found that the plaintiffs did not contest the validity of the documents, and that they agreed that the contractor had done its job properly and was entitled to payment. Thus, the court rejected the defendant's claim that "the plaintiffs and the contractor were involved in a conspiracy of some sort to collect the balance of the claim."

Third, the defendant claimed that, as a matter of interpretation of the insurance policy, the plaintiffs were not entitled to the withheld depreciation. This claim was based on the policy provision limiting the payment to "the amount actually and necessarily *spent* to repair or replace the damaged building structure . . . ." (Emphasis added.) In the defendant's view, the word "spent" as used in this provision means that the plaintiffs were required actually to lay out the money and to pay for the completion of the job represented by the withheld depreciation before the defendant would become obligated to reimburse them for it, and that, correspondingly, incurring a valid debt for that work, albeit completed, was insufficient. Thus, the defendant claimed that, although the plaintiffs may have *incurred a debt* to McNamara for the completion of the repair and replacement of the loss representing the withheld depreciation, the plaintiffs were not entitled to the withheld depreciation because they had not "actually and necessarily spent" the money to repair or replace the loss. The trial court rejected this argument, and held that the incurring of a valid debt, that is, becoming

obligated for the completed work, was sufficient to meet this condition of the insurance policy.

Fourth, relying on the insurance policy provision that the defendant was not obligated to pay more than the actual cash value "until the repair or replacement is completed," the defendant claimed that because, as a factual matter, the replacement work was not completed, the plaintiffs were not entitled to withheld depreciation. The defendant claimed that approximately $20,000 of work had not been done. The plaintiffs' position was that the work was completed. This was a disputed factual matter, and the trial court "conclude[d] that [the] plaintiffs have sustained their burden on this disputed issue. The defendant has not presented sufficient evidence to show that only $54,000 worth of work was done toward correcting the fire damage."

Regarding the plaintiffs' claim for prejudgment interest, the trial court found that the plaintiffs were entitled to such interest based on the amount of withheld depreciation. The trial court selected May 12, 1993, the date of the execution of the release by the plaintiffs, as the date from which the interest was due and payable, and calculated the interest accordingly from that date to the date of the memorandum of decision.

I

The defendant's first claim on appeal is that, under the plain meaning of the insurance policy language, the plaintiffs were not entitled to the withheld depreciation because they had not "spent" the money for the portion of the repair or replacement represented by the depreciation. The defendant argues that, under the dwelling protection provision of the policy, the limit on the defendant's liability to "*the amount actually and necessarily spent* to repair or replace the damaged building structure"; (emphasis added); requires that the plaintiffs actually have paid out the money first, and does not

include the situation in which the plaintiffs incurred a valid debt for the repair or replacement. The defendant supports this argument by reference to Webster's dictionary definition of "spend" as "pay out" or "disburse." Webster's New World Dictionary (Third College Ed. 1988); see also Webster's Third New International Dictionary (defining "spend" as "to distribute or consume in payment or expenditure: pay out: expend, disburse"). We disagree, and conclude that the trial court properly interpreted the insurance policy provision as including the incurring of a valid debt within the meaning of "spend."

Although we have on occasion looked to dictionaries in order to give meaning to words used in a legal context, particularly when that context indicates that the words were used in their ordinary sense, that does not mean, as the defendant's argument suggests, that a dictionary gives *the* definition of any word. A dictionary is nothing more than a compendium of the various meanings and senses in which words have been and are used in our language. A dictionary does not define the words listed in it in the sense of stating what the words mean universally. Rather, it sets out the range of meanings that may apply to those words as they are used in the English language, depending on the varying contexts of those uses. Thus, the question in this case is not whether the dictionary defines "spend" as "pay out," which it does, of course; the question is whether that one definition is the *only* appropriate one to assign to the word as it is used in the policy. We conclude that it is not.

Another meaning of "spend" as revealed by the dictionary is "the general term indicating a paying out of money or, sometimes, incurring obligations calling for its being paid (*spend* a hundred dollars for a coat) . . . ." (Emphasis in original.) Webster's Third New

International Dictionary. Thus, as the dictionary recognizes, in ordinary parlance one might well say "I spent a hundred dollars for this coat," although the buyer bought the coat on credit rather than for cash. The word "spend" as used in the insurance policy provision at issue includes this meaning of the word.

First, where there are two plausible interpretations of insurance policy language, the court will ordinarily select that interpretation that favors the insured over the insurer. *Hertz Corp.* v. *Federal Ins. Co.*, 245 Conn. 374, 382, 713 A.2d 820 (1998). Second, it would defy the reasonable expectations of the insured, and in many cases place undue burdens on him, to require the insured to finance the withheld depreciation portion of the repair or replacement of a fire loss in order to secure the replacement cost coverage for which an additional premium had been paid. Indeed, if the insured first were required to pay out the money for the repair or replacement, rather than merely to incur a valid debt for the completed repair, in a case in which the damaged building was quite old and the loss extensive, the withheld depreciation could be so great as to make the replacement cost coverage largely illusory. We will not interpret insurance policy language to yield such a result.

We are not persuaded by the authorities or policy argument of the defendant to the contrary. Neither of the cases on which the defendant relies for its interpretation of the term "spend"; see *Kolls* v. *Aetna Casualty & Surety Co.*, 503 F.2d 569 (8th Cir. 1974); *Estes* v. *State Farm Fire & Casualty Co.*, 358 N.W.2d 123 (Minn. App. 1984), modified on other grounds, 365 N.W.2d 769 (Minn. 1985); interprets the term "spend" in a replacement cost coverage provision to exclude incurring a valid debt. Moreover, we are unable to find any case that does so.

The defendant argues that this interpretation is necessary in order to guard against a "moral hazard": "If the insurer pays the insured for replacement cost and the insured chooses not to rebuild the property, the insured will realize a profit on his fire loss." Although that is certainly a rational explanation for the insurance policy provision requiring the insured to complete the repair or replacement before the insurer becomes obligated to pay the withheld depreciation; see, e.g., *Steiner* v. *Middlesex Mutual Assurance Co.*, 44 Conn. App. 415, 432 n.15, 689 A.2d 1154 (1997) (recognizing authorities for proposition that " 'fire policy provisions precluding recovery of replacement cost until replacement is complete are reasonable as protection against "the moral hazard," and enforceable' "(; it does not require the further, extraordinary requirement that the insured actually pay out the money for the replacement before seeking replacement cost coverage.

## II

The defendant next claims that, even if incurring a debt is sufficient to comply with the requirement that the money actually be spent, the debt that the plaintiffs incurred was not a valid and enforceable obligation because: (1) the conduct of the plaintiffs and McNamara indicated that they did not view the contract as a legitimate obligation; and (2) the contract between them did not comply with the act. We disagree.

The first aspect of this claim ignores contrary factual findings of the trial court for which there was ample supporting evidence. The court found that the contract documents were sufficient, that the plaintiffs did not contest their terms, and that they agreed that McNamara had performed the contract and was entitled to payment. The court also found that there was no fraudulent scheme between the plaintiffs and McNamara, at

the expense of the defendant, regarding the contract, its performance and payment therefor.

The second aspect of this claim is unpersuasive as a matter of law. The purpose of the act is "to promote understanding by the consumer, to ensure his ability to make an informed decision and to protect him from substantial work by an unscrupulous contractor." *Habetz* v. *Condon*, 224 Conn. 231, 239, 618 A.2d 501 (1992). It is true that compliance with the act is mandatory in order for a contractor to recover on a home improvement contract. *Rizzo Pool Co.* v. *Del Grosso*, 232 Conn. 666, 680, 657 A.2d 1087 (1995). That does not mean, however, that the noncomplying contractor is not entitled to payment when the homeowner, for whose benefit the act's prophylactic provisions were enacted, does not seek the protection of the act, and agrees that the contractor has done the work and should be paid. The act is for the benefit of the consumer, and compliance with its terms may be waived by the consumer, either explicitly or by nonassertion. Thus, the defendant, as the plaintiffs' insurer, cannot interpose noncompliance with the act as a defense to its own insured's claim for replacement cost coverage.

### III

The defendant next claims that the trial court improperly shifted the burden of proof on the plaintiffs' breach of contract claim to the defendant. This claim is without merit.

In rejecting the defendant's claim at trial that the replacement work in fact had not been completed, and that approximately $20,000 worth of the work necessary to repair or replace the loss had not been done, the trial court stated: "Considering all the evidence and the explanations offered, the court concludes that [the] plaintiffs have sustained their burden on this disputed

issue. The defendant has not presented sufficient evidence to show that only $54,000 worth of work was done toward correcting the fire damage." The defendant focuses on the second sentence of that quoted language, but ignores the first sentence. The language of the first sentence, which states that the "plaintiffs have sustained their burden on this disputed issue," adequately makes clear that the court recognized that the plaintiffs had the burden to establish compliance with the conditions of the contract, and that the court required them to meet that burden.[6]

## IV

The defendant's final claim is that the plaintiffs were not entitled to prejudgment interest and that no remand is appropriate because (1) the date selected by the trial court for when the money became due and payable to the plaintiffs was improper, and (2) there was no evidence of a valid alternate date. We agree that the date that the court selected was improper. We disagree, however, that there was no evidence from which the court could have selected a proper date. We conclude, therefore, that a remand is appropriate in this case.

Pursuant to General Statutes § 37-3a,[7] prejudgment interest is awarded in the discretion of the trial court "to

[6] Moreover, to the extent that the trial court's language was unclear or ambiguous on this question, it was incumbent on the defendant, as the appellant, to secure an articulation from the trial court. *Willow Springs Condominium Assn., Inc.* v. *Seventh BRT Development Corp.*, 245 Conn. 1, 53, 717 A.2d 77 (1998). The defendant did not do so.

[7] General Statutes § 37-3a provides: "Rate recoverable as damages. Except as provided in sections 37-3b, 37-3c and 52-192a, interest at the rate of ten per cent a year, and no more, may be recovered and allowed in civil actions or arbitration proceedings under chapter 909, including actions to recover money loaned at a greater rate, as damages for the detention of money after it becomes payable. Judgment may be given for the recovery of taxes assessed and paid upon the loan, and the insurance upon the estate mortgaged to secure the loan, whenever the borrower has agreed in writing to pay such taxes or insurance or both. Whenever the maker of any contract is a resident of another state or the mortgage security is located in another

compensate the prevailing party for a delay in obtaining money that rightfully belongs to him." *Neiditz* v. *Morton S. Fine & Associates, Inc.*, 199 Conn. 683, 691, 508 A.2d 438 (1986). The detention of the money must be determined to have been wrongful. *Sears, Roebuck & Co.* v. *Board of Tax Review*, 241 Conn. 749, 763, 699 A.2d 81 (1997). Its detention can only be wrongful, however, from and after the date on which the court, in its discretion, determines that the money was due and payable. *Foley* v. *Huntington Co.*, 42 Conn. App. 712, 740, 682 A.2d 1026, cert. denied, 239 Conn. 931, 683 A.2d 397 (1996).

The trial court determined in its discretion that the plaintiffs were entitled to prejudgment interest, and the defendant does not challenge that discretionary determination. The May 12, 1993 date selected by the trial court for the beginning of the calculation of the interest period—the date on which the plaintiffs executed the release of all claims except the potential claim for withheld depreciation—however, was improper. On that date, the money for the withheld depreciation was not due and payable because the repair and replacement had not yet been completed.

Contrary to the defendant's argument, however, there was evidence from which the trial court could have determined a proper date for the beginning of the calculation of prejudgment interest. As the plaintiffs pointed out, the defendant's claim adjuster visited the plaintiffs' home in December, 1993, after the completion of the repairs. This would have been an appropriate date from which to calculate when the money was due and payable by the defendant to the plaintiffs.

state, any obligee or holder of such contract, residing in this state, may lawfully recover any agreed rate of interest or damages on such contract until it is fully performed, not exceeding the legal rate of interest in the state where such contract purports to have been made or such mortgage security is located."

The judgment is reversed in part and the case is remanded to the trial court with direction to correct the amount of the judgment for the withheld depreciation to $10,065.90, and to recalculate the prejudgment interest from December, 1993.

In this opinion the other justices concurred.