[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiff, Richard C. MacDonald, seeks money damages and prejudgment interest on the money damages from the defendant, Robert Pinto, in this breach of contact action. The defendant admits that the parties had an oral contract, but disputes the salient terms of that contract as alleged by the plaintiff. The second count of the revised complaint, sounding in unfair trade practices, was dismissed at the conclusion of the plaintiffs evidence at trial, without objection from the plaintiff. Practice Book § 15-8. The court heard testimony on July 11 and July 12. In addition, the parties submitted post-trial proposed findings of fact and conclusions of law. This is the second trial of this matter. This court had the benefit of a decision of the Appellate Court, MacDonald v. Pinto, 62 Conn. App. 317, 771 A.2d 156 (2001), which reversed the decision of the first trial court and remanded for a new trial. CT Page 11502
Pinto worked for Reed Machine until that company closed its doors early in 1992. Reed Machine had rented its business premises from Pinto. Pinto decided to open his own business at the same premises to manufacture and machine component parts for other companies' products. He approached MacDonald and he approached Steve Bilan, both of whom had also worked for Reed Machine, to do work for Pinto at the new business. The new business was a sole proprietorship owned by Pinto. He used the trade name, Pinto Associates. Neither MacDonald nor Bilan was an owner or partner in the new business.
Pinto Associates began operations at the beginning of March, 1992. Shortly before that date, Pinto, MacDonald, and Bilan met together to talk about work duties and terms of compensation. At that meeting, Pinto and MacDonald entered into the oral contract that is the basis for the current dispute.
MacDonald testified that by the terms of the contract, he was to work as an independent contractor and he was to be paid 25 percent of the amount invoiced by Pinto Associates, after deducting the costs only of materials, tooling and outside processing. He stated that Bilan was present at the meeting forming this contract and heard all that transpired. MacDonald believes that Bilan entered into an identical contract on his own behalf at a separate meeting between Pinto and Bilan alone. While MacDonald was to receive 25 percent under the stated formula, Pinto was to receive 50 percent. According to MacDonald, this was because Pinto was to absorb all other overhead costs out of Pinto's share. MacDonald testified that Pinto's share was to pay for all other overhead of every description, including but not limited to, the salaries of all employees subsequently hired. MacDonald further asserted that all the other people working at Pinto Associates while Macdonald worked there knew of the terms of MacDonald's contract with Pinto.
Pinto testified that the terms of the contract were that MacDonald was to work as an independent contractor. He was to be paid 25 percent of the difference between all receivables of Pinto Associates and all expenses of Pinto Associates, as cash flow permitted. In essence, MacDonald was to be paid one quarter of the gross taxable income of the business. Upon MacDonald's severance of his association with the business, he was to be paid 25 percent of the difference between receivables and unpaid expenses at that time. Cash on hand was to be considered part of the receivables for purposes of the calculation. Pinto averred that he himself was to receive $2 for every $1 paid each to MacDonald and to Bilan. The testimony of Bilan, who continues as an employee of Pinto, corroborated Pinto's version of the contract with MacDonald. His own contract with Pinto was the same. The testimony of April Morin, who was Pinto's office manager and bookkeeper in 1994 and 1995, but who is no longer employed by CT Page 11503 Pinto, also fully corroborated Pinto's version of the contract. "Whether and on what terms a contractual commitment has been undertaken are ultimately questions of fact. . . ." Rahmati v. Mehri, 188 Conn. 583,587, 452 A.2d 638 (1982). The court finds the testimony of Pinto, Bilan and Morin to be more credible than that of MacDonald as to the substance of the contract. There was no specific agreement as to the schedule of payments to MacDonald. There were some weeks in which he was paid nothing; at other times he received "bonuses".
There was testimony by Pinto as well as by Bilan that during MacDonald's tenure the business had no other receivables other than those due as the result of invoices issued by the business. This testimony is corroborated by the exhibits showing Schedule C of Pinto's federal income tax returns for the years 1992 through 1995. Throughout the trial, both parties and all witnesses used the terms "invoices" and "receivables" interchangeably. There was no distinction made for invoices that might no longer be collectible and therefore might no longer be receivables. For purposes of this decision, the court, like the parties, treats the two terms as having the same meaning. As to this contract between these two parties, "invoices" and "receivables" are both treated as meaning "monies actually received".
The contract called for MacDonald to be paid 25 percent of the difference between all monies actually received by Pinto Associates and all expenses of Pinto Associates. Pinto himself would be paid 50 percent of the difference between the all monies received and the expenses. Since the business started with no money in the bank, the deal allowed Pinto initially to hold back some compensation from himself, MacDonald, and Bilan, for cash flow purposes in order to maintain a working bank account for the business. Pinto was to pay $1 to MacDonald every time he paid $2 to himself. Pinto acknowledged under oath that he did not adhere strictly to this compensation agreement during 1992, 1993, 1994, and 1995. However, he asserts that the only money owed to MacDonald is $9,602.17, which is 25 percent of the difference between all invoices/funds on hand and all payables on the date MacDonald quit working for Pinto on March 30, 1995. MacDonald claims that even if the court's findings on the contract terms are adverse to him, he is still owed more than $9,602.17 by Pinto because of underpayments in each of the years he worked for Pinto. The documentary evidence shows him to be correct in this claim.
 I. MONEY DAMAGES
In evidence are Pinto's profit or loss statements for each of the calendar years 1992 through 1995 (See Schedule C of Pinto's federal income tax returns.) These were prepared by Pinto's accountant when he did Pinto's annual tax returns. The Schedule C's show the difference CT Page 11504 between receipts and expenses for Pinto Associates, including depreciation, for each of the years 1992 through 1995 . . . Depreciation is a reasonable business expense. The difference shows as "Gross income" on line 7 on each of the four statements. The "Gross income" number is Pinto's gross income after the deduction of all expenses and also after the deduction of MacDonald's pay. MacDonald's compensation is included as part of the "Cost of labor" on line 35 or part of "Other costs" on line 37 of each Schedule C. Amounts actually paid to MacDonald are in evidence from his 1099 federal income tax forms for 1992, 1993, and 1994 and from adding together all the actual checks issued to him by Pinto in 1995.
For the year 1992, the Schedule C gross income to Pinto was $38,277. If that was 50 percent of the total pot to be split with MacDonald and Bilan, then MacDonald should have received half that amount — $19,138. He actually received $12,425. This leaves an apparent shortfall of $6,713. However, if Pinto had paid the additional $6,713 to MacDonald in 1992, the gross income line 7 on Schedule C would have read $31,564 and MacDonald would only have been entitled to $15,782 less the $12,425 actually received, for a shortfall of $3,357. It is necessary then to derive a mathematical formula whereby an amount is subtracted from Pinto's gross income each year and added to MacDonald's compensation each year so that the result is a 2:1 ratio.
(Gross Income of Pinto plus Actual Pay to MacDonald) — 3 = Corrected Pay Corrected Pay minus Actual Pay = Shortfall
Since in 1995, MacDonald worked only one-quarter of the year up to March 30, for Pinto Associates, Pinto's gross income figure for 1995, must be divided by 4 for purposes of the corrected pay calculation.
YEAR GROSS INCOME ACTUAL PAY CORRECTED PAY SHORTFALL
1992 $38,277 $12,426 $16,901 $ 4,475 1993 81,384 29,469 36,951 7,482 1994 98,980 33,531 44,170 10,639 1995 45,425 (1/4 of $181,702) 9, 845 18,423 8,578 ------ TOTAL SHORTFALL $31,174
 IL INTEREST
On several occasions beginning in 1992, MacDonald complained to Pinto about underpayment. MacDonald was given access to the business ledgers, but not to Pinto's profit and loss statements, until this litigation. Pinto, on the other hand, had all financial information at hand necessary for the calculation of amounts owed to MacDonald under the contract. For the years 1992 through 1994, Pinto knew or should have known as of March CT Page 11505 30, 1995, exactly what was owed to MacDonald. Pinto had his own profit and loss statements for those three years as well as the 1099's issued by Pinto to MacDonald. As to the monies withheld for the years 1992 through 1994, those monies were due and payable on March 30, 1995. As to the amount owed for the year 1995. Pinto had the information by March 30, 1996, in order to get his own income tax retum prepared. Also, he had the ability to add together all the checks issued to MacDonald in 1995, or to issue a 1099 form to MacDonald for the year 1995. The amount owed for the year 1995, was due and payable no later than March 30, 1996. Pinto detained the money wrongfully from MacDonald. By the terms of General Statutes § 37-3a, interest at the rate of 10 percent per annum may be recovered as damages for the wrongful detention of money after it becomes payable. The purpose of that statute is to allow for compensation for the prevailing party when there has been a delay in obtaining money that rightfully belongs to him. See Northrop v. Allstate Ins. Co.,247 Conn. 242, 254-255, 720 A.2d 879 (1998); Neiditz v. Morton S. Fine Associates, Inc., 199 Conn. 683, 691, 508 A.2d 438 (1986). Prejudgment interest, as an element of damages, may be awarded by the trial court when equitable considerations deem that it is warranted. See Nor'easterGroup, Inc. v. Colassale Concrete, Inc., 207 Conn. 468, 482, 542 A.2d 692
(1988); Paulus v. LaSala, 56 Conn. App. 139, 147, 742 A.2d 379 (1999), cert. denied, 252 Conn. 928, 746 A.2d 789 (2000).
On the $22,596 owed for the years 1992, 1993, and 1994, the simple interest calculated at 10 percent from March 30, 1995 to March 30, 2001, is $13,558 and the simple interest from March 30, 2001 to August 24, 2001, is $913 for a total of $14,471. On the $8,578 owed for the year 1995, the simple interest calculated from March 30, 1996 to March 30, 2001, is $4,289 and the simple interest from March 30, 2001 to August 24, 2001, is $346 fora total of $4,635. The total for the interest to August 24, 2001, is $19,106.
 III. CONCLUSION
Although the terms of the contract between the parties are those asserted by Pinto, Pinto breached that contract. Judgment shall enter in favor of the plaintiff in the amount of $31,174 on the underlying debt plus interest to today's date in the amount of $19,106. The total is $50,280. The plaintiff is entitled to costs.
Winslow, J.