******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* DUSTIN RUOCCO
(AC 34763)

Alvord, Keller and Harper, Js.

*Argued March 5—officially released July 22, 2014*

(Appeal from Superior Court, judicial district of New

Haven, Moore, J.)

*Alice Osedach*, assistant public defender, with whom, on the brief, was *Katrina Cessna*, certified legal intern, for the appellant (defendant).

*Jennifer F. Miller*, special deputy assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Marc Ramia*, senior assistant state's attorney, for the appellee (state).

*Opinion*

HARPER, J. The defendant, Dustin Ruocco, appeals from the judgment of conviction, rendered after a jury trial, of burglary in the third degree in violation of General Statutes § 53a-103 (a)[1] and larceny in the third degree in violation of General Statutes § 53a-124 (a) (2).[2] The defendant claims that the trial court improperly (1) failed to instruct the jury that it may draw no unfavorable inferences from his failure to testify, as mandated by General Statutes § 54-84 (b); (2) excluded expert testimony; and (3) interpreted the term "building" for purposes of his burglary conviction. We agree that the court improperly failed to give the mandatory jury instruction, and therefore reverse the judgment of the court.

The jury reasonably could have found the following facts. The defendant and his girlfriend, Denise Cintron, rented a basement apartment from Thomas Blake in East Haven. Blake's property is immediately adjacent to property owned by Donald Gennette (Donald) and Maria Gennette (Maria). There is a shed in the backyard of the Gennettes' property located approximately twenty feet from the Gennette-Blake property line.

On May 5, 2011, Donald and Maria went to work at 6:20 a.m. and 7:15 a.m., respectively. Maria returned home at 11:40 a.m. to take care of her grandchild while her son went to work. Upon arriving home, Maria observed the defendant and Cintron sitting in the defendant's vehicle, a red Toyota Corolla. Maria then took her dog for a walk in her backyard and observed that the defendant's car, although on the Blake property, was parked immediately next to the Gennette-Blake property line. Maria noted that the defendant's car was parked in close proximity to her shed, and that the location of the car was unusual because she had never seen the car parked there before. Maria observed that Cintron was now alone in the vehicle.

Cintron exited the vehicle and began to ask Maria questions about her dog. This interaction was unusual, according to Maria, because Cintron had never spoken to her during the nine months that Cintron had resided on the Blake property. After Cintron had questioned her for about two minutes, Maria went back inside her house. Approximately ten minutes later, at 12:15 p.m., Maria, her son, and the grandchild departed, leaving no one in the house. Upon leaving, Maria observed that the defendant's car had not moved.

Maria returned home at 3:15 p.m. and noticed that an exterior light on the shed was turned on, which she described as unusual. Donald, an experienced electrician, explained how he had wired the exterior light on the shed.[3] He explained that a switch inside the shed controls the exterior light. If the switch is in one position, the light stays on continuously. If the switch is in

the other position, the light is controlled by a motion sensor mounted on the exterior of the shed. The motion sensor will turn the light on if someone moves in front of it. He explained, however, that he configured the motion sensor so that it is disabled while it is light outside. The only explanation for the light being on during the day is that someone went inside the shed and put the switch in the position that turns the light on continuously. According to Donald, on May 5, 2011, the exterior light was off when he left for work and should have remained off throughout the day.

Donald was "suspicious" after Maria told him that the defendant's car had been parked on the property line and that the exterior light on the shed was on when she arrived home. Donald went into the shed and noticed several items were missing. He immediately called the police and spoke with his neighbor, Rick Gallo, who resides on the other side of the Gennettes' property. Gallo was unemployed at the time and testified that he was home painting his son's room on the date in question.

At 2 p.m. on May 5, 2011, Gallo observed the defendant enter the Gennettes' shed, remove items from it, and place them in the trunk of the defendant's car, which was parked in close proximity to the Gennette-Blake property line. Gallo stated that, although he observed someone other than one of the Gennettes removing items from their shed, he "[did not] want to assume that [the defendant] was stealing" because it was possible that the defendant was assisting Donald with his work as an electrician. Gallo later reported his observations to the police after Donald notified him that he called to report the burglary.

Officer Craig Michalowski of the East Haven Police Department responded and met with Donald, Maria, Gallo, and Blake. Donald told Michalowski that the following items were taken from his shed: (1) a chain saw; (2) a miter saw; (3) a drill; and (4) a "cordless kit" containing a drill and two saws. The next day, after Donald conducted a more thorough search of the shed, he reported to the police that he was also missing (1) sixty to seventy feet of "two aught" copper wire; (2) "a couple [of] rolls" of "number two" wire; (3) approximately 750 feet of yellow "Romex" wire; and (4) approximately 750 feet of white "Romex" wire. Donald had this wire on hand in order to perform a specific modification to his house's electrical system.

After his initial investigation, Michalowski identified the defendant as a potential suspect in the crime.[4] He continued the investigation by checking the records from area scrap yards and pawn shops in order to determine whether the defendant sold any of the items taken from the shed. Michalowski explained that when someone sells something to either a scrap yard or pawn shop, the businesses keep a record of the date and time of

the sale, the item sold, and the seller's name and address. The businesses send these records to the police department approximately every six weeks. Michalowski checked the records on file at the police department and found that, at 6:55 a.m. on the day after the burglary, the defendant sold wire to a scrap yard that was consistent with the type of wire reported missing from the Gennettes' shed.

The defendant was arrested on June 14, 2011, and charged with burglary in the third degree and larceny in the third degree. At trial, the defendant argued that Donald had lied about the amount of wire taken in order to defraud his insurance company.[5] He specifically argued that Donald's account of the amount and value of the wire taken from the shed was inconsistent. Moreover, the defendant argued that the amount of wire purportedly in the shed was disproportionate to the amount necessary to modify the electrical system for the Gennettes' house as Donald had claimed. As such, the defendant argued, the state did not prove beyond a reasonable doubt that the property taken was worth more than $2000, the amount necessary to be convicted of larceny in the third degree pursuant to § 53a-124 (a) (2). The jury returned a verdict of guilty on both counts, and the court rendered judgment accordingly. Additional facts will be set forth as necessary.

I

The defendant first claims that the trial court improperly failed to instruct the jury that it may draw no unfavorable inferences from his failure to testify at trial. Section 54-84 (b) provides in relevant part: "Unless the accused requests otherwise, the court shall instruct the jury that they may draw no unfavorable inferences from the accused's failure to testify. . . ." This instruction is mandatory unless the defendant requests otherwise. *State* v. *Stewart*, 64 Conn. App. 340, 349, 780 A.2d 209, cert. denied, 258 Conn. 909, 782 A.2d 1250 (2001). Both parties concede that the jury was not charged with the mandatory instruction. The state claims, however, that the record is inadequate for our review because it is ambiguous as to whether the defendant waived the mandatory instruction, and therefore the defendant's claim must fail. The defendant argues that there is no evidence in the record that he waived the instruction and, therefore, failing to give the instruction is plain error that requires a new trial. We agree with the defendant and reverse the judgment of the trial court.

The following facts are necessary for the resolution of this claim. After the parties presented their closing arguments, and before adjourning for its lunch recess, the court stated: "Counsel, I've given you each a copy of my proposed charge. . . . [I]f you have any questions, or concerns, or comments, I'll be available at 1:30 in my chambers. If I don't see you at 1:30, I'll just assume that you have no comments or questions. But we will

be starting a little before 2 because I'd like to have as much time this afternoon for the jury and its deliberations." After the recess, the jury entered the courtroom and the court gave the jury charge. The court did not put on the record whether any party had come to its chambers to discuss the charge. Furthermore, there is no reference to any charge conference and no copy of the proposed charge in the record.

The defendant concedes that this claim is unpreserved, but argues that the judgment should be reversed pursuant to the plain error doctrine. See Practice Book § 60-5. Our Supreme Court "recently clarified the two step framework under which we review claims of plain error. First, we must determine whether the trial court in fact committed an error and, if it did, whether that error was indeed plain in the sense that it is patent [or] readily discernable on the face of a factually adequate record, [and] also . . . obvious in the sense of not debatable. . . . [T]his inquiry entails a relatively high standard, under which it is not enough for the defendant simply to demonstrate that his position is correct. Rather, the party seeking plain error review must demonstrate that the claimed impropriety was so clear, obvious and indisputable as to warrant the extraordinary remedy of reversal. . . . [U]nder the second prong of the analysis we must determine whether the consequences of the error are so grievous as to be fundamentally unfair or manifestly unjust. . . . Only if both prongs of the analysis are satisfied can the appealing party obtain relief." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *State* v. *Coward*, 292 Conn. 296, 306–307, 972 A.2d 691 (2009).

A

The parties disagree as to whether the record is adequate for review, which is a requirement under the first prong of the plain error doctrine. Id., 307. The state argues that "there is a possibility that the defendant could have waived [the mandatory instruction]" in an in-chambers conference during the lunch recess. Because we must presume that the trial court acted properly; *Gaines* v. *Commissioner of Correction*, 306 Conn. 664, 690, 51 A.3d 948 (2012); the state claims there exists "a clear . . . manner in which the trial court could have acted properly" if the defendant waived the mandatory instruction in chambers. As a result, the record is inadequate because, as the state argues, "the defendant has not demonstrated that the trial court's failure to give the instruction was not directly and correctly responsive to [the defendant's] request that it not so instruct." Because there exists this possibility that the defendant waived the mandatory instruction in chambers, the state argues, the record is incomplete until it reflects whether an in-chambers conference took place, and if so, whether the defendant waived the mandatory instruction during that confer-

ence. The state ultimately argues that because the record is inadequate and the defendant, as the appellant, has the burden of providing an adequate record, the defendant's claim must fail. We disagree.

We conclude that the record before us is clear, unambiguous, and adequate for review with respect to the defendant's claim that the court improperly refrained from giving the no unfavorable inference instruction. Presuming that the trial court acted properly, as we must, the record leads to the conclusion that no off-the-record charge conference occurred. Had an in-chambers charge conference occurred, as the state suggests, then a court acting properly would have summarized it on the record, as directed by Practice Book § 42-19[6] and *State* v. *Baptiste*, 302 Conn. 46, 57–58, 23 A.3d 1233 (2011).[7] The record reflects that the trial court offered the parties the opportunity to take exception to the proposed jury charge, which is not contained in the record. There is no record of either party taking exception to the charge and no record of the defendant waiving the mandatory instruction, but there is a record of the charge being read to the jury without the mandatory instruction. Because the complete jury charge is found in the transcript, the record is sufficient to review a claim of plain error due to the omission of a no unfavorable inference instruction. See *State* v. *Stewart*, 60 Conn. App. 301, 308–309, 759 A.2d 142 (no record of waiver and total omission of no unfavorable inference instruction plain error), remanded, 255 Conn. 913, 763 A.2d 1039 (2000) (appeal withdrawn October 1, 2000), on remand, 64 Conn. App. 340, 780 A.2d 209, cert. denied, 258 Conn. 909, 782 A.2d 1250 (2001).[8]

If we adopted the state's reasoning, and concluded that the record is inadequate and, as a result, the defendant's claim fails, that would place the burden on the defendant to provide a record sufficient to support the state's waiver argument. If the state intends to argue that the defendant waived a mandatory instruction, the burden is on the state to secure an adequate record to support that argument. See *State* v. *Brown*, 299 Conn. 640, 659, 11 A.3d 663 (2011) (no waiver pursuant to *State* v. *Kitchens*, 299 Conn. 447, 482–83, 10 A.3d 942 [2011], when "no record of the charging conference or copy of the court's intended charge . . . . [because the court] cannot determine from the record whether the copy of the final instructions given to defense counsel included the correct charge or the charge as actually given" [citation omitted]). Although the state correctly notes that it is the appellant's responsibility to provide an adequate record for review; Practice Book § 61-10; as far as the defendant is concerned, the record is adequate to review his claim. The same is not true, however, of the state's claim that the defendant may have possibly waived the no unfavorable inference instruction. Placing the burden on the defendant to secure a record adequate to review the state's claim—as opposed to his

claim—is manifestly unjust. See Practice Book § 60-1 (rules of practice interpreted liberally to avoid surprise or injustice). We therefore conclude that the record before us is factually adequate.

The record reflects, and both parties concede, that the jury charge did not include an instruction that no adverse inferences were to be drawn from the defendant's failure to testify, as mandated by § 54-84 (b). "[N]oncompliance with § 54-84 (b) is plain error . . . . We have regularly characterized as error any but the most minor departure from the language that § 54-84 (b) requires." (Internal quotation marks omitted.) *State* v. *Suplicki*, 33 Conn. App. 126, 128, 634 A.2d 1179 (1993), cert. denied, 229 Conn. 920, 642 A.2d 1216 (1994). We therefore conclude that the record is complete and the error is obvious.

B

In order for the defendant to be entitled to reversal of the judgment, the error must be one that affects the integrity of the judicial proceedings and results in manifest injustice. *State* v. *Coward*, supra, 292 Conn. 307. "[T]he total omission of the no adverse inference instruction is plain error that is not subject to a harmless error analysis. The unconditional language of the statute is a legislative mandate and the failure to use that language is a pivotal aspect of the defendant's privilege against self-incrimination. The statutory language is based on a constitutional right, and its omission can never be harmless." (Internal quotation marks omitted.) *State* v. *Suplicki*, supra, 33 Conn. App. 130. Accordingly, we conclude that the failure to include the no adverse inference instruction, as mandated by § 54-84 (b), is plain error that requires a new trial.

Although our resolution of the defendant's first claim is dispositive of this appeal, the defendant's remaining claims regarding the preclusion of expert testimony and the court's interpretation of the term "building" are likely to arise during the defendant's new trial, and, therefore, we will address those claims. See *State* v. *Lee*, 229 Conn. 60, 65, 640 A.2d 553 (1994).

II

The defendant claims that the court improperly precluded the testimony of his expert witness because (1) the expert was not qualified, and (2) the testimony was irrelevant. We conclude that a portion of the expert's proposed testimony was improperly precluded as irrelevant, but that the error was harmless. The following facts are necessary for the resolution of this claim.

Donald testified that he had planned to use the wire that he had been storing in the shed to modify the electrical system serving his house. He specifically purchased the wire to "put a new service up" and rewire his house accordingly.[9] Donald testified that he usually purchases electrical supplies from a wholesaler and

overestimates the amount he needs to complete a job.

Donald reported to the police that the property stolen, including the wire, was valued at approximately $3000. He determined the value of the property based on prices provided to him by an electrical supply company that he uses on a regular basis. Maria relayed the values as determined by Donald to their insurance company, and no one from the company came to the Gennettes' residence to investigate the claim. The Gennettes collected approximately $3000 for the loss pursuant to their homeowner's insurance policy.

The defendant proffered expert testimony from Thomas Lipsett, an electrician with twenty-five years of experience. The subject matter of his testimony would have been the price of the various types of wire taken from the shed and the amount of wire necessary to "upgrade the service" of the Gennettes' residence.[10] The court precluded Lipsett from testifying because he did not have any "specialized training" that would permit him to testify as to the price of the wire at the time of the offenses at issue. The court also concluded that the testimony regarding the amount of wire necessary to perform the work on the Gennettes' house was irrelevant. We conclude that the court properly precluded Lipsett from testifying as to the price of the wire, but improperly concluded that evidence concerning the amount of wire necessary to perform the electrical work at issue was irrelevant.

A

We first set forth our standard of review. "[T]he trial court has wide discretion in ruling on the admissibility of expert testimony . . . ." (Internal quotation marks omitted.) *Sullivan* v. *Metro-North Commuter Railroad Co.*, 292 Conn. 150, 157, 971 A.2d 676 (2009). The well established standard of review for claims regarding the admissibility of expert testimony is abuse of discretion. Id. "In determining whether there has been an abuse of discretion, the ultimate issue is whether the court could reasonably conclude as it did. . . .

"This court recently articulated the test for the admission of expert testimony . . . . Expert testimony should be admitted when: (1) the witness has a special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues. . . . In other words, [i]n order to render an expert opinion the witness must be qualified to do so and there must be a factual basis for the opinion." (Citations omitted; footnote omitted; internal quotation marks omitted.) Id., 157–58.

In order to possess the requisite skill or knowledge to qualify as an expert, "[i]t is not essential that an expert witness possess any particular credential . . .

so long as his education or experience indicate that he has knowledge on a relevant subject significantly greater than that of such persons lacking such education or experience." (Internal quotation marks omitted.) *Beverly Hills Concepts, Inc.* v. *Schatz & Schatz, Ribicoff & Kotkin*, 247 Conn. 48, 62, 717 A.2d 724 (1998). An expert witness' special skill or knowledge "may emanate from a myriad of sources, such as teaching, scholarly writings, study or practical experience." *Davis* v. *Margolis*, 215 Conn. 408, 417, 576 A.2d 489 (1990). Regardless of the source of the expert's specialized knowledge, a court properly may preclude testimony if the expert's knowledge does not pertain to the specific matter at issue. See *Baranowski* v. *Safeco Ins. Co. of America*, 119 Conn. App. 85, 97, 986 A.2d 334 (2010) (out-of-state insurance agent precluded from testifying as expert because expert had not "acquired sufficient knowledge, either from reading, experience or course work, of the applicable standard of care in Connecticut in 1998").

Lipsett testified that he had twenty-five years of experience as an electrician and that at the time of trial he served as a supervisor electrician for the West Haven Board of Education. This position requires him to render cost estimates for various electrical jobs performed in the course of his employment. He also stated that he was familiar with the type of wire taken from the shed and described his knowledge of the value of the wire in question. Lipsett stated that, on the basis of his experience and expertise as an electrician, he knew the current value of the type of wire in question.

Lipsett acknowledged, however, that the price of the wire in question fluctuates. He admitted that before providing an official estimate as part of his employment, he first contacts a supplier to check the price of supplies. He also admitted that he was not familiar with the value of the wire in question on May 5, 2011, the date of the burglary. In order to determine the price of the wire at issue on that specific date, Lipsett stated that he would have to contact a supplier who keeps a record of the daily price of supplies. He informed the court, however, that in preparation for his testimony he had not researched the price for the relevant wire on May 5, 2011, and could testify only as to the price of the wire on the day prior to his testimony.

The court properly concluded that Lipsett was not qualified as an expert regarding the price of the wire because he had no knowledge of the value of that wire on the date of the offenses at issue. In order to find the defendant guilty of larceny in the third degree, the jury was required to find that the value of the property taken exceeded $2000 at the time and place of the crime. General Statutes §§ 53a-121 and 53a-124. The obvious deficiency in Lipsett's testimony was his lack of knowledge as to the price of the wire on the date of the

offenses at issue. His testimony concerning the relevant price of the wire did not depend on his specialized knowledge or skill but only on his ability to read and relay the information provided by a supplier who kept the appropriate records. Because his testimony as to the price of the wire would amount to reading the supplier's records without employing any specialized knowledge or skill to interpret or transform that information, we conclude that the court did not abuse its discretion in precluding his testimony. Compare *State* v. *McNally*, 39 Conn. App. 419, 424, 665 A.2d 137 ("expert opinion . . . properly excluded on the ground that a determination of a person's intoxication based *solely on observation and not on an interpretation of sobriety tests* is within the general knowledge of the jury" [emphasis in original]), cert. denied, 235 Conn. 931, 667 A.2d 1269 (1995), with *State* v. *Lamme*, 19 Conn. App. 594, 603–604, 563 A.2d 1372 (1989) (expert testimony that defendant intoxicated admissible because based on interpretation of sobriety test), aff'd, 216 Conn. 172, 579 A.2d 484 (1990). Lipsett did not demonstrate that he possessed any specialized knowledge or skill relative to the price of the subject wire on the relevant date, and therefore his testimony was properly precluded. See *Baranowski* v. *Safeco Ins. Co. of America*, supra, 119 Conn. App. 97–98.

B

The defendant also claims that the court improperly precluded Lipsett's testimony regarding the amount of materials required to upgrade the service on the Gennettes' house on the ground that the testimony was irrelevant, and that this error deprived him of his constitutional right to present a defense. We conclude that the testimony was relevant, but precluding this testimony was harmless beyond a reasonable doubt.

The court has wide discretion in precluding expert testimony as irrelevant if it is not helpful to the jury in considering the issues. *Sullivan* v. *Metro-North Commuter Railroad Co.*, supra, 292 Conn. 157–58. "Evidence is irrelevant or too remote if there is such a want of open and visible connection between the evidentiary and principal facts that, all things considered, the former is not worthy or safe to be admitted in the proof of the latter." (Internal quotation marks omitted.) *State* v. *Billie*, 250 Conn. 172, 181, 738 A.2d 586 (1999). "Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . One fact is relevant to another if in the common course of events the existence of one, alone or with other facts, renders the existence of the other either more certain or more probable. . . . Evidence is not rendered inadmissible because it is not conclusive. All that is required is that the evidence tend to support a relevant fact even to a slight degree, so long as it is not prejudicial or merely cumulative." (Internal quotation marks omit-

ted.) Id.

In order to convict the defendant of larceny in the third degree, the state had to prove that the property taken from the shed was worth at least $2000 at the time and place of the crime. General Statutes §§ 53a-121 and 53a-124. The state presented evidence that the Gennettes received $3000 from their insurance company to compensate them for the value of the property stolen. The evidence also established that the items taken were worth the following amounts: (1) a chain saw, $300; (2) a miter saw, $400; (3) a drill, $200; and (4) a "cordless kit" containing a drill and two saws, $500. The total value of these items was $1400. Whether the settlement from the insurance company accurately reflected that the value of the property taken exceeded $2000, as required for a conviction of larceny in the third degree, therefore depended on the value of the wire taken from the shed.

At trial, the defendant sought to have Lipsett testify that the amount of wire that Donald claimed he had in the shed was more than the amount of wire needed to upgrade the service and modify the wiring in the house. Lipsett testified that, in the twenty-five years during which he had been in business as an electrician, he upgraded the service on residential homes approximately fifty to sixty times. The defendant proffered Lipsett's testimony as relevant to the jury's determination of what property was in the shed: "I believe that [Lipsett] can assist the jury in determining the facts that are at issue and give a deeper understanding of the evidence so that they will understand whether . . . [Donald] even actually was likely to have [the wire] in the shed." In precluding Lipsett's testimony, the court reasoned: "[W]hat [wire] was necessary to be used as upping the service in a house is not relevant to this particular issue." Later, the court explained: "What a person might use on a job, what a person might have in their home, that's not what's in front of the [jury]. What's in front of the [jury] is, did an individual take a material, which a person had in their home, away from that home; that's the material issue in front of the [jury]."

Although we agree with the trial court that the ultimate issue to be determined by the jury was not whether Donald intended to upgrade the service on his house, the jury did have to find that the property taken from the shed was worth more than $2000 in order to find the defendant guilty of larceny in the third degree. Because the amount of wire in the shed directly related to the total value of the property stolen, Lipsett's testimony had the tendency to aid the jury in determining the value of the property taken, and therefore the testimony was relevant. Even though this testimony was helpful to the jury only if the jury also knew the price of the wire, that deficiency alone does not render Lipsett's

testimony irrelevant. See *State* v. *Billie*, supra, 250 Conn. 181 (relevancy determined by considering fact " 'alone or with other facts' "). The court, therefore, improperly precluded Lipsett's testimony.

An improper evidentiary ruling is subject to harmless error analysis, and if the impropriety is constitutional in nature the state has the burden of proving that the error was harmless beyond a reasonable doubt. *State* v. *Osimanti*, 299 Conn. 1, 15–16, 6 A.3d 790 (2010). Even if we assume, arguendo, that the impropriety here affected the defendant's right to present a defense, the state has met its burden of demonstrating the harmlessness of the error. Although the jury was presented with testimony about the amount of wire purportedly in the shed and that the total insurance settlement was $3000 for all of the property stolen, it could not determine the value of the wire alone without evidence as to the price or per foot value of the wire at the time of the offense. The defendant could not establish the relevant price of the wire through Lipsett's testimony, and did not inform the court that he planned to do so in another manner. The specific amount of wire in the shed, standing alone, could not have called into question the validity of the insurance settlement or aided the trier of fact with respect to determining the value of all the property taken from the shed. The jury needed to be presented with both—the amount of wire and the price of that wire—in order for the amount of wire in the shed to have an effect on the jury's deliberations. We therefore conclude that precluding Lipsett's testimony regarding the amount of wire necessary to complete the work on Donald's house was harmless beyond a reasonable doubt.

### III

The defendant's next claim is that the court improperly interpreted the term "building" for purposes of burglary in the third degree. By way of a motion to dismiss, the defendant argued that a shed is not a "building," as defined in General Statutes § 53a-100 (a) (1). On appeal, the defendant claims that the court improperly denied his motion to dismiss because it concluded that the Gennettes' shed is a building "based on . . . a statutory construction analysis which is flawed most notably by its omission of any consideration or deference to the legislature's stated intent." The defendant essentially argues that because various dictionaries provide a "range of meanings" of the word "building," we should look to the statute's legislative history to define that term. We disagree and conclude that the court properly denied the defendant's motion to dismiss.

The defendant claims that the court improperly interpreted the term "building," and therefore our review is plenary and directed by General Statutes § 1-2z. See *State* v. *Ward*, 306 Conn. 698, 707–708, 52 A.3d 591 (2012). The defendant's argument that we should look

to the legislative history is unpersuasive, as our analysis continues to be guided by the plain meaning rule, as codified in § 1-2z, even when there are a range of dictionary meanings for a statutory term. Our Supreme Court has noted that "[a] dictionary is nothing more than a compendium of the various meanings and senses in which words have been and are used in our language. A dictionary does not define the words listed in it in the sense of stating what the words mean universally. Rather, it sets out the range of meanings that may apply to those words as they are used in the English language, depending on the various contexts of those uses." *Northrop* v. *Allstate Ins. Co.*, 247 Conn. 242, 250, 720 A.2d 879 (1998). "As Justice Thurgood Marshall so aptly put it: 'Condemned to the use of words, we can never expect mathematical certainty from our language.' . . . Thus, any word in the English language—except for words of specialized contexts, such as mathematics or science— will ordinarily have multiple meanings, depending on the context in which it has been used." (Citation omitted.) *Community Renewal Team, Inc.* v. *United States Liability Ins. Co.*, 128 Conn. App. 174, 180, 17 A.3d 88, cert. denied, 301 Conn. 918, 21 A.3d 463 (2011). If we accepted the defendant's argument, § 1-2z would be rendered superfluous because we would find multiple dictionary definitions for every term we attempt to interpret, and therefore we would always be required to look to the legislative history. Accordingly, the trial court did not err by interpreting the term building as used in § 53a-100 (a) (1) in accordance with the plain meaning rule as codified in § 1-2z.

Section 1-2z directs us to determine the meaning from the text of the statute itself and its relationship to other statutes. If, after doing so, the term is plain and unambiguous then our inquiry ends and extratextual evidence shall not be considered. *State* v. *Ward*, supra, 306 Conn. 708. The term "building" is defined in § 53a-100 (a) (1): " 'Building,' in addition to its ordinary meaning, includes any watercraft, aircraft, trailer, sleeping car, railroad car or other structure or vehicle or any building with a valid certificate of occupancy. . . ." We look to the dictionary definition to determine the ordinary meaning of building. *State* v. *Domian*, 35 Conn. App. 714, 724, 646 A.2d 940 (1994), aff'd, 235 Conn. 679, 668 A.2d 1333 (1996). The ordinary meaning of "building" is: "A structure with walls and a roof, esp. a permanent structure." Black's Law Dictionary (9th Ed. 2009). "Structure" in turn is defined as: "Any construction, production, or piece of work artificially built up or composed of parts purposefully joined together." Id.

Donald testified that the dimensions of the shed were eight feet by twelve feet, with a door, and that the shed was used to store his tools, supplies, gym equipment, and holiday decorations. The defendant does not argue that the shed lacked walls or a roof. We conclude that the court properly determined that the shed in question

was a building for purposes of § 53a-100 and denied the defendant's motion to dismiss accordingly.

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other judges concurred.

[1] General Statutes § 53a-103 (a) provides: "A person is guilty of burglary in the third degree when he enters or remains unlawfully in a building with intent to commit a crime therein."

[2] General Statutes § 53a-124 (a) provides in relevant part: "A person is guilty of larceny in the third degree when he commits larceny, as defined in section 53a-119, and . . . (2) the value of the property or service exceeds two thousand dollars . . . ."

[3] Donald testified that he has been an electrician for Amtrak for thirteen years. He stated that he has held an electrician's license for approximately twenty-five years and performs a wide variety of residential work in addition to his regular employment.

[4] Michalowski testified that he was informed that Cintron was involved in the burglary as well. He was unable to obtain sufficient personal information to seek a warrant for her arrest.

[5] The defendant also argued that he was somewhere else at the time of the crime and that Gallo, being unemployed, had a motive to steal the items in question.

[6] Practice Book § 42-19 provides: "After the close of evidence but before arguments to the jury, the judicial authority shall, if requested, inform counsel out of the presence of the jury of the substance of its proposed instructions. The charge conference shall be on the record or summarized on the record."

[7] "[W]e . . . take this opportunity to remind trial courts that, although off-the-record charge conferences are acceptable, if the trial court chooses to conduct the charging conference off the record, it should take care to accurately note the matters discussed in the conference once the parties are back on the record, and the court should invite counsel's acquiescence with regard to those comments." *State* v. *Baptiste*, supra, 302 Conn. 57–58.

[8] In *State* v. *Stewart*, supra, 60 Conn. App. 309, the state unsuccessfully "attempted to rectify the record to reflect what it claimed was the defendant's in-chambers request that the court not give the no favorable inference instruction." This court reversed the judgment of the trial court because it failed to give the mandatory instruction. Id., 309–10. In granting the state's petition for certification to appeal, our Supreme Court also "ordered that the trial court articulate the facts concerning discussions, if any, among the state's attorney, defense counsel and the court during a charging conference, relative to the court's giving a 'no unfavorable inference' instruction to the jury in this matter." *State* v. *Stewart*, 255 Conn. 913, 763 A.2d 1039 (2000). After receiving the articulation, our Supreme Court remanded the matter, and this court concluded that the defendant waived the instruction during an in-chambers conference. *State* v. *Stewart*, supra, 64 Conn. App. 343–44, 354–55.

We note that in *Stewart* the record reflected that an in-chambers charge conference had occurred, but the substance of the conference was unknown. Our Supreme Court's order granting the state's petition for certification referred to "discussions . . . during a charging conference . . . ." *State* v. *Stewart*, supra, 255 Conn. 913. On the other hand, in the present case, it is unknown whether the parties even engaged in a charge conference.

[9] Donald explained that the "service" is the wiring that runs from the electric meter into a house.

[10] The defendant also stated that Lipsett would have testified "whether or not [the defendant's] car, a 2003 Toyota Corolla, with a 13.6 cubic foot trunk, would be able to hold 689 feet of wiring at that weight along with [miter] saws, chain saws, cases holding three different other types of saws, drills, and . . . whatever . . . other items were taken." Lipsett did not testify that he was familiar with either the capacity of the trunk in a 2003 Toyota Corolla or the towing capacity of that vehicle, and, therefore, we conclude that Lipsett's testimony in this respect was properly precluded because he had no expertise in these matters. Cf. *Sullivan* v. *Metro-North Commuter Railroad Co.*, 292 Conn. 150, 158, 971 A.2d 676 (2009) (witness must be qualified to render expert opinion).